STATE OF NORTH CAROLINA v. TERRANCE DURRELL CAMPBELL

No. 366A02

(Filed 19 August 2005)

## 1. Search and Seizure— investigative stop—motion to suppress evidence—reasonable suspicion of criminal activity

The trial court did not err in a capital first-degree murder case by denying defendant's motion to suppress all evidence discovered after he was stopped by police in Aiken, South Carolina even though defendant contends he was seized within the meaning of the Fourth Amendment before his arrest for operating a motor vehicle while his license was suspended, because: (1) officers do not violate the Fourth Amendment's prohibition of unreasonable seizures merely by approaching individuals on the street or in other public places and putting questions to them if they are willing to listen, and in the instant case the officer had not told defendant that he could not leave when defendant consented to speak with the officer; and (2) at the point where the officer asked defendant to "hold up" while she transmitted information about defendant to the dispatcher, the officer had reasonable articulable suspicion that defendant was involved in criminal activity including where the officer received a complaint from a K-Mart employee about a suspicious person whose car was parked for a lengthy period of time in the parking lot; defendant acknowledged that he had been parked in the lot; defendant said he had completed a job in Columbia, South Carolina, that he was traveling home to North Carolina, and that he had stopped in Aiken to take a nap even though Aiken is forty-five miles west of Columbia, is not on the route to North Carolina, and the K-Mart was more than ten miles from the interstate connecting Columbia and Aiken; and defendant had no driver's license with him and did not know the name of his friend to whom the car belonged.

## 2. Jury— selection—capital trial—voir dire—stake out questions

The trial court did not err in a capital first-degree murder case by refusing to allow defendant to ask prospective jurors during voir dire whether defendant's election not to testify would adversely influence their decision given the fact that defendant had made a confession, because: (1) parties are not allowed to

stake out a prospective juror's opinion based on specific facts; (2) defendant was allowed to ask prospective jurors whether his decision not to testify would affect their impartiality, and jurors were instructed that defendant had a right not to testify; (3) defendant was able to inquire of prospective jurors whether they would be able to follow the law; (4) defendant had sufficient opportunity to examine prospective jurors on their ability to be fair and impartial in this trial and on their ability to render a decision without regard to defendant's failure to testify; and (5) although defendant now asserts that the ruling violated his federal and state constitutional rights, defendant failed to assert this argument before the trial court and has thus waived it.

### 3. Jury— selection—capital trial—excusal for cause

The trial court did not abuse its discretion in a capital first-degree murder case by excusing a prospective juror for cause under N.C.G.S. § 15A-1212, because: (1) the prospective juror lived down the road from the victim, had known the victim his entire life, had been in the victim's home, and had attended the victim's funeral; (2) the prospective juror indicated that he would prefer not to look at pictures and asked to be deferred; (3) while the prospective juror stated that he could set aside his personal feelings and be a fair and impartial juror, the trial court was in a unique position to assess the prospective juror's impartiality; and (4) defendant failed to assert any constitutional claims at trial and thus has waived them.

### 4. Evidence— expert testimony—location of blood spatter—intent

The trial court did not err in a capital first-degree murder case by overruling defendant's objections to portions of the testimony of the State's expert witness about the two locations of blood spatter in the victim's home used to show intent, because: (1) the expert had studied panic disorders, was accepted by the trial court as an expert in forensic psychiatry, and as such was competent to evaluate the evidence to give an opinion as to what defendant's mental state might have been at the time of the crime; and (2) defendant's objection was based on the two locations of assault not being in evidence whereas the expert relied on the SBI report which was admitted into evidence as part of another witness's testimony.

**5. Appeal and Error— preservation of issues—failure to object**

Although defendant contends the trial court erred in a capital first-degree murder case by allowing the State's expert witness to testify that the existence of two areas of attack was inconsistent with defendant's being panicked, this assignment of error is dismissed because defendant did not object to this testimony at trial and thus did not preserve this issue for appeal under N.C. R. App. P. 10(b)(1).

**6. Evidence— expert opinion—specialized knowledge—defendant's state of mind**

The trial court did not err in a capital first-degree murder case by allowing the State's expert witness to give his opinion as to defendant's state of mind based on the fact that the victim was lying prone on the floor when at least one blow was dealt because: (1) the expert was trained to recognize links between behavior and a person's state of mind; and (2) the expert had specialized knowledge to assist the trier of fact to understand the evidence or to determine a fact in issue. N.C.G.S. § 8C-1, Rule 702.

**7. Appeal and Error— preservation of issues—failure to object**

Although defendant contends the trial court erred in a capital first-degree murder case by allowing the State's expert witness to testify regarding the bloody towel and pillowcase, this assignment of error is dismissed because defendant did not object to this exchange at trial and thus did not preserve this issue for appeal under N.C. R. App. P. 10(b)(1).

**8. Appeal and Error— preservation of issues—failure to raise constitutional issue at trial**

Although defendant contends the trial court violated his federal and state constitutional rights by including portions of testimony from the State's expert witness in a capital first-degree murder case, this assignment of error is dismissed because defendant failed to raise these constitutional issues at trial and thus did not preserve them for appeal.

**9. Evidence— exclusion of testimony—prior violent sexual act by victim**

The trial court did not err in a capital first-degree murder case by excluding testimony regarding an alleged prior violent sexual act by the victim even though defendant wanted to use it

to show that the victim was the first aggressor in the incident leading up to his death, because: (1) defendant had not offered any evidence of self-defense at the time he attempted to introduce this particular testimony of two witnesses, and thus, the fact that an unidentified man accused the victim of assault several years before the crime for which defendant was charged took place did not make any fact in the case more probable or less probable; and (2) although defendant now contends the testimony was independently admissible to impeach the testimony of another witness who stated that she had never known the victim to be violent, defendant failed to make this argument at trial and cannot now advance a different theory on appeal.

**10. Evidence— cross-examination—sexual paraphernalia found in victim's home**

The trial court did not abuse its discretion in a capital first-degree murder case by refusing to allow defendant to cross-examine witnesses and by sustaining the State's objection to questions regarding sexual paraphernalia found in the victim's home, because: (1) in regard to the questioning of a witness about sexual paraphernalia, its probative value was substantially outweighed by the danger of unfair prejudice; (2) in regard to the cross-examination of a detective, the identity of the murderer was not at issue and thus the used condom found in a bag in the storage room had no bearing on the fact of the murder itself; (3) in regard to the fact that defendant was not allowed to conduct redirect examination of a doctor regarding the sexual paraphernalia, defendant's attempt to show that the victim was homosexual does not prove that the victim was the first aggressor and the evidence was very inflammatory and unfairly prejudicial; (4) defendant's argument that the State opened the door to the questioning by asking the doctor if he had examined the physical evidence admitted at trial was without merit since questioning about the specific paraphernalia would not have explained or rebutted evidence adduced by the State on cross-examination of the doctor; and (5) defendant's constitutional arguments are not properly before the Supreme Court when defendant did not raise these issues at trial.

**11. Criminal Law— prosecutor's argument—"The Last Supper" tapestry**

The trial court did not abuse its discretion in a capital first-degree murder case by refusing to restrict how the prosecution

made reference to the victim's tapestry depicting the Biblical scene "The Last Supper" which was hung on the wall over the victim's couch where blood was found spattered on it, because: (1) description of a crime scene, although necessarily prejudicial to a defendant, is not so unfairly prejudicial as to outweigh its probative value in helping jurors and the court understand how and where the crime took place; (2) nothing in the record suggests that the description was used excessively and solely to inflame the passions and prejudices of the jury against defendant; and (3) defendant's constitutional arguments are not properly before the Supreme Court when defendant did not raise these issues at trial.

## 12. Criminal Law— prosecutor's argument—defendant staking out store to rob it

The trial court did not abuse its discretion in a capital first-degree murder case by failing to intervene ex mero motu during the State's closing argument upon hearing the prosecutor argue that defendant was attempting to rob the K-Mart in Aiken, South Carolina, because: (1) the actions of defendant during the pertinent time period were subject to suspicion and the prosecutor could reasonably argue the inference from the evidence that defendant was staking out the store in order to rob it; (2) contrary to defendant's assertion, defense counsel was not taken by surprise by this argument as the prosecutor had signaled this argument during the charge conference; and (3) defendant's constitutional arguments are not properly before the Supreme Court when defendant did not raise these issues at trial.

## 13. Criminal Law— prosecutor's argument—payment of defense expert witness—credibility

The trial court did not abuse its discretion in a capital first-degree murder case by failing to intervene ex mero motu during the portion of the State's closing argument that attacked the testimony of defendant's expert witness and that allegedly misstated portions of that expert's testimony, because: (1) the prosecutor's statements about the expert's credibility were not grossly improper, although the statement that the expert was a witness that the defendant could buy verged on being unacceptable, and defense counsel used this same tactic in an attempt to discredit the State's mental health expert; (2) in regard to any alleged misstatements of the expert's testimony, the essence of the prosecutor's argument was that the expert's assessment of defendant's

mental state did not necessarily take into account all of defendant's actions surrounding the murder and even if the comments were improper, the jury instructions informed the jury not to rely on the closing arguments as its guide in evaluating the evidence; and (3) viewed as a whole and in light of the wide latitude afforded the prosecutor in closing argument, the prosecutor's challenged arguments did not so infuse the proceeding with impropriety as to impede defendant's right to a fair trial.

**14. Criminal Law— prosecutor's argument—defendant's failure to testify**

The trial court did not err in a capital first-degree murder case by overruling defendant's objection to the portion of the prosecutor's closing argument that allegedly alluded to defendant's failure to testify, because: (1) during closing arguments, the prosecutor may properly bring to the jury's attention the failure of a defendant to produce exculpatory evidence or to contradict evidence presented by the State; (2) the prosecutor's statement was not an improper comment on defendant's failure to testify, but instead reminded the jury that defendant's confession was not admitted as substantive evidence and could not be used for that purpose; and (3) defendant's constitutional arguments are not properly before the Supreme Court when defendant did not raise these issues at trial.

**15. Homicide— felony murder—motion to dismiss—sufficiency of evidence**

The trial court did not err by failing to dismiss the charge of felony murder, nor did it violate defendant's constitutional rights by submitting the N.C.G.S. § 15A-2000(e)(5) aggravating circumstance that the capital felony was committed while defendant was engaged in the commission of robbery, because: (1) although the exact details of the murder and robbery are lacking, the evidence taken in the light most favorable to the State permits a reasonable jury to infer that defendant murdered and robbed the victim without any break in the series of events; and (2) defendant's constitutional argument is not properly before the Supreme Court when defendant did not raise this issue at trial.

**16. Sentencing— capital—exclusion of evidence of prior violent sexual act by victim**

The trial court did not err during a capital sentencing proceeding by failing to allow two witnesses to testify that a man had

knocked on their doors and claimed that the victim had attempted to rape him, because: (1) although the specific incident was excluded from evidence, defendant was still able to rebut the State's evidence of the victim's nonviolent reputation by introducing evidence of the victim's reputation for making unwanted sexual advances on men; (2) the vagueness of the specific incident, particularly that the man in question was unidentified, undermined the reliability of that evidence; (3) defendant has not demonstrated why exclusion of this evidence was improper; and (4) even if the evidence was improperly excluded, defendant was able to rebut the State's evidence and was not prejudiced as a result.

## 17. Sentencing— capital—aggravating circumstance— previously convicted of felony involving use or threat of violence

The trial court did not err, abuse its discretion, or commit plain error in a capital sentencing proceeding by admitting evidence of the circumstances surrounding defendant's 1985 conviction for kidnapping including details of rapes, because: (1) the State is allowed to present the circumstances of the prior felony in order to meet its burden to show beyond a reasonable doubt the aggravating circumstance under N.C.G.S. § 15A-2000(e)(1) that defendant had been previously convicted of a felony involving the use or threat of violence; (2) evidence concerning the events that took place during the kidnapping was necessary to show that the victim was terrorized by defendant and that her fear was well founded at the time of the actual kidnapping; and (3) although defendant contends that the trial court should have intervened ex mero motu when the prosecutor argued that at the time of the kidnapping in 1985 the marital rape exemption prevented defendant from being charged with rape, defendant did not object to this argument at trial and the argument did not rise to the level of being so grossly improper as to impede defendant's right to a fair trial.

## 18. Sentencing— capital—prosecutor's argument—victim killed to eliminate witness

The trial court did not abuse its discretion by failing to intervene ex mero motu in a capital sentencing proceeding when the prosecutor made the statement during closing arguments that the victim was killed for the purpose of witness elimination, because: (1) the remarks were made when discussing the mitigating cir-

**STATE v. CAMPBELL**

[359 N.C. 644 (2005)]

cumstance that defendant lacked the capacity to appreciate the criminality of his conduct; and (2) the argument was a reasonable inference given defendant's history of crime.

**19. Sentencing— capital—prosecutor's argument—confession after DNA testing of physical evidence**

The trial court did not abuse its discretion by failing to intervene ex mero motu in a capital sentencing proceeding when the prosecutor argued that defendant confessed after DNA testing even though defendant contends he wrote the confession on 4 February 2000 and the DNA testing of physical evidence was not done until much later, because the argument was a reasonable inference from the evidence adduced at trial when defendant wrote a confession letter knowing that his clothing had been confiscated and DNA evidence was on his confiscated clothing.

**20. Sentencing— capital—prosecutor's argument—defendant stalking his next victim**

The trial court did not abuse its discretion by failing to intervene ex mero motu in a capital sentencing proceeding when the prosecutor argued that defendant was stalking his next victim while waiting in the car at the K-Mart parking lot in Aiken, South Carolina, because a reasonable inference could be made from the evidence in the case since defendant previously had committed crimes in which he staked out his victim.

**21. Sentencing— capital—prosecutor's argument—number of aggravating circumstances**

The trial court did not err in a capital sentencing proceeding by allowing the State to repeatedly refer to five aggravating circumstances during closing argument when in fact only three aggravating circumstances were submitted, because: (1) three convictions were used to support the (e)(3) aggravating circumstance that defendant had previously been convicted of a felony involving violence to the person, and each conviction could have been submitted to the jury as a separate (e)(3) aggravator; (2) the prosecutor also stated that the weighing process does not involve counting the number of mitigators and the number of aggravators to see which side has the largest number, and the trial court reiterated this point to the jury during instructions; (3) the copy of the issues and recommendation as to punishment form given to the jurors listed three possible aggravators; and (4) given that the

**STATE v. CAMPBELL**

[359 N.C. 644 (2005)]

convictions could have been listed as separate aggravators and that the jurors were properly instructed as to the law on the subject, the prosecutor's comments could not have impeded defendant's right to a fair trial.

## 22. Constitutional Law— effective assistance of counsel—dismissal of claims without prejudice to pursue in postconviction motion for appropriate relief

Although defendant contends he received ineffective assistance of counsel in a capital first-degree murder case by his counsel's promising the jury, without delivering, evidence and instructions on self-defense and intoxication based on an erroneous belief that defendant's confession would be admitted as substantive evidence, and by concluding that even if the confession were admitted into evidence the confession alone would be enough to establish self-defense and intoxication, these claims are dismissed without prejudice to defendant to pursue them in a postconviction motion for appropriate relief, because evidentiary issues need to be developed before defendant will be in a position to adequately present his possible ineffective assistance claim on these issues.

## 23. Constitutional Law— effective assistance of counsel—failure to object to testimony—failure to impeach witness

Defendant did not receive ineffective assistance of counsel in a capital first-degree murder case based on his counsel's failure to object to the testimony of the victim's grandniece who stated that she had never known the victim to be violent toward anyone and by failing to impeach that witness, because: (1) even assuming arguendo that it was improper for the trial court to allow the question when defendant had not introduced evidence of the victim's character, defendant failed to show prejudice or that a reasonable probability existed that the outcome of the trial would have been different; (2) the specific instances of conduct that defendant argues should have been used to impeach the witness were not allowed by the trial court in either the guilt phase or the sentencing proceeding; and (3) sound strategy reasons exist for not attempting to impeach a biased witness when the answer to the question is unknown, and inquiry about her knowledge of the specific incident where the victim allegedly committed a prior violent sexual act against an unidentified male would likely have produced a negative answer.

STATE v. CAMPBELL

[359 N.C. 644 (2005)]

**24. Constitutional Law— effective assistance of counsel—alleged concession of guilt to second-degree murder without defendant's consent**

Defense counsel in a first-degree murder case did not admit defendant's guilt of second-degree murder without defendant's consent in violation of defendant's right to the effective assistance of counsel when he stated during closing argument that "the only difference is a second degree murder case lacks that specific intent element, and I submit to you that's where we are," because: (1) defense counsel was pointing out to the jury that specific intent was lacking in this case and that the lack of specific intent was the only difference between second-degree murder and first-degree murder; and (2) defense counsel was arguing to the jury that without specific intent, the most serious crime for which defendant could be convicted would be second-degree murder.

**25. Constitutional Law— effective assistance of counsel—failure to request instruction**

Defendant did not receive ineffective assistance of counsel in a capital first-degree murder case based on his counsel's failure to request an instruction in the sentencing proceeding that defendant's confession could be considered as substantive evidence in the sentencing proceeding, because: (1) throughout defendant's closing argument in the sentencing proceeding, defendant's counsel, without objection from the prosecutor or intervention by the trial court, argued the substance of defendant's statement; (2) the jurors were afforded the opportunity to consider defendant's character and the circumstances surrounding the crime in weighing whether, in light of the aggravating and mitigating circumstances, defendant deserved a sentence less than death; and (3) defendant failed to show that a reasonable probability exists that a different outcome would have resulted had trial counsel requested an instruction that the statement be considered as substantive evidence.

**26. Constitutional Law— effective assistance of counsel—failure to object to closing arguments**

Defendant did not receive ineffective assistance of counsel in a capital first-degree murder case based on his counsel's failure to object to allegedly improper closing arguments by the prosecutor in both the guilt phase and the sentencing proceeding including the argument that defendant was intending to rob the

K-Mart, the demeaning reference to the monetary compensation of defendant's expert witness, an alleged misstatement of defendant's expert witness testimony, the argument regarding evidence of alleged rapes previously committed by defendant, the argument that defendant killed the victim for the purpose of eliminating a witness to his actions, the argument implying that defendant did not confess until his DNA was collected, the argument that defendant was stalking his next victim at the Aiken K-Mart, and the references to five aggravators instead of the three that were submitted to the jury, because: (1) none of the arguments was so grossly improper as to render the trial fundamentally unfair; and (2) a reasonable probability does not exist that the outcome of the trial would have been different had defendant objected to them.

## 27. Constitutional Law— effective assistance of counsel—failure to preserve challenge for cause issues

The trial court did not abuse its discretion in a capital first-degree murder case by denying three of defendant's challenges for cause, and defendant did not receive ineffective assistance of counsel based on his counsel's failure to preserve those three challenge for cause issues for appeal, because: (1) although one prospective juror was initially equivocal about whether he could follow the law on defendant's right not to testify, he stated he could disregard prior knowledge and impressions, follow the trial court's instructions on the law, and render an impartial, independent decision based on the evidence; (2) although a second prospective juror was an acquaintance of a deputy who was a witness in the case, the prospective juror stated that they were not good friends, that he could follow the law, that he knew witnesses could be wrong or mistaken, that he could apply the same test of truthfulness as in everyday interactions, and that he could follow the court's instructions on witness credibility; (3) although the second prospective juror also indicated a possible bias against defendant for failing to testify, he indicated his ability to follow the law as given to him by the trial judge; (4) although a third juror indicated that drinking does not provide any excuse for criminal behavior, that people claim being a victim of a homosexual assault as a "cop-out" for their behavior, that life without parole for first-degree murder is not a sufficiently severe punishment, that death is a more appropriate punishment for first-degree murder, and that life without parole is an unfair pun-

ishment since taxpayers have to pay to keep a person incarcerated when that person has taken the life of another, the juror indicated after being questioned on each issue that she could follow the law, put aside her predispositions, and give fair consideration to all the evidence including evidence of alcohol use and impairment and that she could weigh both life and death as punishments; and (5) assuming arguendo that the trial court ruled improperly in denying any one of these three challenges for cause, defendant has failed to demonstrate he was forced to seat a juror with whom he was dissatisfied.

**28  Sentencing— death penalty—proportionate**

A sentence of death was proportionate in a first-degree murder case, because: (1) defendant was convicted of first-degree murder on the basis of malice, premeditation and deliberation and under the felony murder rule; (2) the jury found two of the three aggravating circumstances submitting including under N.C.G.S. § 15A-2000(e)(3) that defendant had been previously convicted of a felony involving the use or threat of violence to the person and under N.C.G.S. § 15A-2000(e)(5) that the murder was committed while defendant was engaged in the commission of robbery with a dangerous weapon; and (3) defendant killed the victim in the victim's home.

Justice NEWBY did not participate in the consideration or decision of this case.

Appeal as of right pursuant to N.C.G.S. § 7A-27(a) from a judgment imposing a sentence of death entered by Judge Charles H. Henry on 27 March 2002 in Superior Court, Pender County, upon a jury verdict finding defendant guilty of first-degree murder. Heard in the Supreme Court 13 April 2004.

*Roy Cooper, Attorney General, by Mary D. Winstead, Assistant Attorney General, for the State.*

*Staples S. Hughes, Appellate Defender, by Barbara S. Blackman, Assistant Appellate Defender, for defendant-appellant.*

PARKER, Justice.

Defendant Terrance Durrell Campbell was indicted on 21 February 2000 for first-degree murder and robbery with a dangerous weapon of "Buddy" William Hall. Defendant was tried capitally and

found guilty of first-degree murder based on malice, premeditation and deliberation and under the felony murder rule, with robbery as the underlying felony. After a capital sentencing hearing, the jury recommended that defendant be sentenced to death; and the trial court entered judgment accordingly.

The State's evidence tended to show that on 3 February 2000 defendant was sitting in a car in a K-Mart parking lot in Aiken, South Carolina. A K-Mart employee, Valerie Green, noticed defendant when she arrived for work at 5:15 p.m. that day. Another K-Mart employee, Gail Wertz, went outside at regular intervals throughout the evening and noticed that defendant was slumped down in the car and that he could see her. Ms. Wertz became concerned that "he was up to no good" and called 911 at approximately 8:45 p.m., fifteen minutes before the store was closing. Employees from the K-Mart tried to get the license plate number, but defendant drove away.

Officer Tracy Saxton of the Department of Public Safety in Aiken, South Carolina, was dispatched to the K-Mart parking lot at approximately 8:50 p.m. A K-Mart employee directed Officer Saxton's attention to defendant's car as defendant was leaving the parking lot. Officer Saxton followed defendant from the K-Mart parking lot to a nearby convenience store and pulled her car in behind him at the gas pumps. Defendant had gotten out of the car and was walking toward the convenience store, counting change from a paper bag in his hand. Officer Saxton asked to speak with defendant, and the two met each other about halfway between her vehicle and the store entrance. Defendant told her he had been in the K-Mart parking lot because he was taking a nap. Defendant told Officer Saxton that he was on his way back to North Carolina from a construction job in Columbia, South Carolina, but that he had stopped in Aiken to rest. Officer Saxton asked defendant for his driver's license, which he could not produce. She then asked him for registration and insurance information on the car, and defendant replied that he did not have it because the car was not his. When pressed for information about the owner of the car, defendant stated that the car belonged to a friend of his who let him borrow the car, but defendant could not remember the friend's name. Defendant gave his name as "Terry Campbell" to Officer Saxton, who radioed to dispatch to do a driver's license check. Officer John Gregory arrived at the scene and remained with defendant while Officer Saxton called in the request. The initial check did not find anything on Terry Campbell, so the two officers asked defendant if he had any paperwork with his name on it. After

defendant retrieved a pay stub from a bag in the car, Officer Saxton radioed the information to dispatch.

While waiting for a response from dispatch, the officers asked defendant if they could search the car, and defendant consented. Among the items found in the car were two men's wallets, neither of which belonged to defendant; a few containers, one of which appeared to contain urine; and a radio. In the trunk officers found a .22 caliber rifle, an axe, and some clothes. The wallets contained identification cards in the names of William Arthur Hall and Guy Miles. The officers asked defendant if the rifle was his. Defendant replied that he did not know it was in the car; but when Officer Gregory picked up the rifle, defendant said, "Watch it, it's loaded." Officer Gregory cleared the rifle for safety purposes by removing the bullets.

Dispatch notified the officers that defendant's driver's license had been suspended in North Carolina. The officers placed defendant under arrest for driving without a South Carolina driver's license. An inventory of the car was taken. The Aiken Department of Public Safety notified the authorities in Pender County, North Carolina, about the wallets found in the car. Pender County law enforcement officers used the information from the identification cards to conduct well-being checks on the two men whose wallets were found.

Pender County Sheriff's Deputy Jody Woodcock was dispatched to William Hall's house. All the doors were locked, but Deputy Woodcock was able to enter through an unlocked kitchen window. The deputy found Mr. Hall dead on the living room floor. Mr. Hall was found on his back with his head partially underneath a small table. Blood was pooled around his head, and cigarette butts and a paper cup were scattered around him. The only clothes on the body were long john bottoms and socks; Mr. Hall's genitalia were exposed. Blood was spattered on the living room ceiling and walls, including on a tapestry depicting the Last Supper that hung over the couch. Blood was also pooled on the couch. A towel lying on a love seat in the living room had blood on it, as did a table near the couch. In the master bedroom blood smears were found on a pillow lying near the foot of a bed, and bloodstains appeared on the floor. Coins and a pair of men's trousers were lying on the floor of the bedroom, and coins and loose coin wrappers were found on the bedroom closet floor. Blood also appeared on the door between the living room and the foyer.

Evidence collected at the crime scene and from defendant's body was sent to the State Bureau of Investigation (SBI) for DNA testing. DNA profiles taken from the cigarette butts collected from around the victim's body were consistent with the victim and defendant. Blood found on defendant's jeans matched the victim's.

An autopsy performed on the victim revealed approximately eleven blunt trauma wounds to the head. The wounds were found on the front, top, and back of the head along with a skull fracture located under the wounds on the left front of the head. According to John Almeida, M.D., the pathologist who performed the autopsy, the injuries resulted in massive cerebral damage and intercerebral hemorrhage. Dr. Almeida testified that the victim died as a result of these trauma wounds, which were most likely caused by a "heavy cutting instrument." Several non-fatal wounds were also found on the victim's left forearm. Dr. Almeida determined that these wounds were defensive in nature. An analysis of the victim's blood showed no alcohol in his system.

During their investigation of the murder, police found video surveillance tapes showing defendant and the victim together at a Wal-Mart store in Wallace, North Carolina, at approximately 5:00 or 5:30 p.m. on 2 February 2000, the night of the murder. The victim and defendant were also seen together in a videotape purchasing a bottle of gin at an ABC store in Wallace that night.

After defendant was arrested, he was taken to the county jail, where his clothes and personal items were collected. On 4 February 2000 defendant wrote a thirteen page statement in which he gave his version of the events surrounding the murder. On 5 February 2000 defendant waived extradition and was transferred from South Carolina to Pender County, North Carolina.

George Corvin, M.D., an expert in forensic psychiatry, was called as a defense witness and testified that defendant did not suffer from any severe psychiatric illness but that defendant suffered from anxiety and had a history of significant problems with alcohol. Dr. Corvin also testified that defendant had extreme beliefs and fears regarding homosexuality. Additionally, Dr. Corvin stated that defendant felt that being touched by another man, however benignly, was "evil" and "unGodly" and that it would "change your manhood."

## PRETRIAL ISSUE

[1] Defendant first assigns error to the trial court's denial of his motion to suppress all evidence discovered after he was stopped by

STATE v. CAMPBELL

[359 N.C. 644 (2005)]

the police in Aiken, South Carolina. This argument is based on defendant's contention that he was illegally seized in violation of his constitutional rights when he was detained by Officer Saxton, that there was no reasonable suspicion for the seizure, and that all evidence obtained as a result of the illegal seizure should have been suppressed. We disagree.

The Fourth Amendment to the United States Constitution protects the "right of the people to be secure . . . against unreasonable searches and seizures." U.S. Const. amend. IV. The Fourth Amendment is applicable to the states through the Due Process Clause of the Fourteenth Amendment. *See State v. Watkins*, 337 N.C. 437, 441, 446 S.E.2d 67, 69 (1994). Article I, Section 20 of the North Carolina Constitution provides similar protection against unreasonable seizures. N.C. Const. art. I, § 20.

The trial court conducted a hearing on defendant's motion to suppress on 25 February 2002. Testimony was taken from Officers Saxton and Gregory, as well as from Chief Investigator Dwayne Courtney. Based on the evidence produced at the hearing, the trial judge denied defendant's motion and later issued a written order with findings of fact and conclusions of law. The trial court made the following findings of fact:

1. Aiken, South Carolina, public safety officer Tracy Saxton was dispatched at approximately 8:50 p.m. to the parking lot of K-Mart to respond to a call regarding a suspicious individual. The caller to the police department was an employee of K-Mart who indicated that an individual had parked his vehicle in the parking lot and had been sitting in it for three to four hours, and, during that period, had not gotten out of the vehicle. When Officer Saxton arrived at the store, an employee advised her that the vehicle they had called about at that time was pulling out of the parking lot. The employee pointed out to the officer a Crown Victoria automobile which was leaving the parking lot of the store. Officer Saxton only spent a few seconds with the employee before driving off to follow the identified vehicle.

2. Officer Saxton observed the vehicle leave the parking lot, travel out onto Silver Bluff Road and pull up and stop at a Golden Pantry convenience store. After the Crown Victoria motor vehicle had come to a complete stop, the defendant, who was the driver of the vehicle, got out of the vehicle and started walking in the direction of the store. Officer Saxton pulled up behind the

defendant's vehicle and stopped without activating a siren or blue lights. She radioed to Ayden [sic] Police Department notifying them of her location and that she was out with a "suspicious vehicle." When she finished her transmission, she got out of her vehicle [and] asked the defendant if she could speak to him. At that time the defendant was out of his vehicle and ten feet from the officer. They met to speak at the rear of the defendant's vehicle.

3. Officer Saxton asked the defendant if he had just left the K-Mart parking lot. The defendant indicated that he had and further advised her that he had been sleeping in his vehicle in the parking lot. He told the officer that he had stopped in Aiken to take a nap, and that he was driving home to North Carolina having finished a job in Columbia, South Carolina. Aiken is about forty-five miles west of Columbia. Officer Saxton asked for the defendant's driver's license and motor vehicle registration. The defendant responded that he did not have any identification, but told her that his name was Terry Campbell and gave her his date of birth. He further indicated to the officer that the car did not belong to him, but belonged to a friend. When asked to identify his friend's name, the defendant could not recall the friend's name. By this time about two to three minutes had passed since Officer Saxton initiated the conversation. During this conversation, Aiken public safety officer John Gregory arrived at the location in his police cruiser.

4. As a result of the conversation, Officer Saxton asked the defendant to "hold up and she would be back up with him." Officer Saxton returned to her police vehicle and called her dispatcher to check the North Carolina driver's license status for Terry Campbell with the date of birth given her by the defendant. She was advised that no such individual showed up. She returned to the defendant and asked him if he had anything with his identification on it. He indicated that he had a paycheck stub with his name on it, and Officer Gregory accompanied the defendant to his vehicle where the defendant pointed out a bag in the front seat of his car which contained the pay stub. Officer Gregory reached inside the vehicle to retrieve the bag, first making a cursory look inside the bag to see if it contained any weapons. The defendant did not state or show any objection to Officer Gregory's actions. Once the paystub was retrieved, this additional information was relayed to the dispatcher by Officer Saxton. An

STATE v. CAMPBELL

[359 N.C. 644 (2005)]

N.C.I.C. search was conducted, and it revealed that the defendant's driver's license in North Carolina had been suspended indefinitely for failing to appear in court. This information was relayed to Officer Saxton.

5. Upon returning to the defendant, Officer Saxton asked him if he had any weapons or contraband in the vehicle. After responding in the negative, the defendant was asked if the officers could have permission to search his automobile. The defendant gave permission to search the vehicle. Officer Gregory discovered two wallets above the visors. Also uncovered was a registration to the vehicle in the name of William Hall. A rifle was found in the trunk of the car. The defendant was asked if he owned the gun, and the defendant indicated that he did not know the gun was inside the vehicle. He did advise, however, that the gun was loaded. Also found in the vehicle [were] a bottle containing urine, a portable radio, and a broken axe handle.

6. The defendant was advised that he was going to be arrested for no operator's license. Prior to his arrest, weapons were not displayed by the officers, and the defendant was not told that he could not leave nor was he restrained in any way by the officers. The defendant did not ask to leave nor did he attempt to leave the presence of the officers. Fifteen to twenty minutes passed from the time Officer Saxton first spoke to the defendant and his later arrest.

Based on these findings, the trial court concluded: (i) "defendant was not seized within the meaning of the Fourth Amendment until his arrest for operating a motor vehicle while his license was suspended"; (ii) "[e]ven if the defendant was detained and entitled to the protection of the Fourth Amendment at any time prior to his arrest, Officer Saxton had reasonable suspicion supported by articulable facts known to her that the defendant was involved in criminal activity and warranted further inquiry and investigation"; (iii) "[i]f the defendant was detained prior to his arrest, the detention was brief and was justified by the circumstances known to the officer"; and (iv) "[t]he initial search of the vehicle driven by the defendant by the Aiken law enforcement officers was with the consent of the defendant given freely and voluntarily, without coercion, duress or fraud."

On a motion to suppress evidence, the trial court's findings of fact are conclusive on appeal if supported by competent evidence. *State v. Braxton*, 344 N.C. 702, 709, 477 S.E.2d 172, 176 (1996).

STATE v. CAMPBELL

[359 N.C. 644 (2005)]

Defendant has not assigned error to any specific finding of fact. Therefore, the findings of fact are not reviewable, and the only issue before us is whether the conclusions of law are supported by the findings, a question of law fully reviewable on appeal. *See State v. Steen*, 352 N.C. 227, 238, 536 S.E.2d 1, 8 (2000), *cert. denied*, 531 U.S. 1167, 148 L. Ed. 2d 997 (2001); *State v. Hyde*, 352 N.C. 37, 45, 530 S.E.2d 281, 288 (2000), *cert. denied*, 531 U.S. 1144, 148 L. Ed. 2d 775 (2001); *State v. Brooks*, 337 N.C. 132, 140-41, 446 S.E.2d 579, 585 (1994). Defendant specifically contests the trial court's conclusion of law that "defendant was not seized within the meaning of the Fourth Amendment until his arrest for operating a motor vehicle while his license was suspended." Defendant contends that he was seized when Officer Saxton initiated the encounter and that this seizure was not based upon reasonable suspicion as required by the Fourth Amendment.

The United States Supreme Court has long recognized that "[l]aw enforcement officers do not violate the Fourth Amendment's prohibition of unreasonable seizures merely by approaching individuals on the street or in other public places and putting questions to them if they are willing to listen." *United States v. Drayton*, 536 U.S. 194, 200, 153 L. Ed. 2d 242, 251 (2002). As the Supreme Court stated in *Florida v. Bostick*, 501 U.S. 429, 115 L. Ed. 2d 389 (1991):

> Our cases make it clear that a seizure does not occur simply because a police officer approaches an individual and asks a few questions. So long as a reasonable person would feel free "to disregard the police and go about his business," *California v. Hodari D.*, the encounter is consensual and no reasonable suspicion is required. The encounter will not trigger Fourth Amendment scrutiny unless it loses its consensual nature. The Court made precisely this point in *Terry v. Ohio*: "Obviously, not all personal intercourse between policemen and citizens involves 'seizures' of persons. Only when the officer, by means of physical force or show of authority, has in some way restrained the liberty of a citizen may we conclude that a 'seizure' has occurred."

501 U.S. 429, 434, 115 L. Ed. 2d 389, 398 (1991) (citations omitted). Seizure of a person within the meaning of the Fourth Amendment occurs "only if, in view of all of the circumstances surrounding the incident, a reasonable person would have believed that he was not free to leave." *United States v. Mendenhall*, 446 U.S. 544, 554, 64 L. Ed. 2d 497, 509 (1980) (opinion of the Court by Stewart, J., joined

by Rehnquist, J., Powell, J., Burger, C.J. & Blackmun, J., concurring in the judgment). Thus, "[e]ven when law enforcement officers have no basis for suspecting a particular individual, they may pose questions, ask for identification, and request consent to search luggage— provided they do not induce cooperation by coercive means." *Drayton*, 536 U.S. at 201, 153 L. Ed. 2d at 251. *See also Brooks*, 337 N.C. at 143-44, 446 S.E.2d at 586-87 (holding that no seizure occurred when an officer approached a parked car and initially asked the occupant where his gun was after seeing an empty holster on the seat), *and State v. Farmer*, 333 N.C. 172, 186-88, 424 S.E.2d 120, 128-29 (1993) (holding that the defendant was not seized when two officers approached the defendant on a public street and asked him questions).

Viewed in light of these legal principles, the trial court's findings of fact support the conclusion that defendant was not seized when Officer Saxton first spoke to defendant, as he now contends. After defendant had stopped his car at the convenience store, Officer Saxton pulled in behind him without activating the patrol car's blue light or siren. Defendant was walking toward the store when Officer Saxton exited her car and asked to speak with him. The two were about ten feet apart and met each other halfway between the vehicles and the entrance to the store. The officer asked defendant if he had been in the K-Mart parking lot. Defendant answered in the affirmative and explained that he had been sleeping. He told the officer he had stopped in Aiken to take a nap and that he was driving home to North Carolina after finishing a job. When asked for his driver's license and vehicle registration, defendant indicated that he did not have any identification and that the car belonged to a friend whose name he could not recall. Defendant said his name was Terry Campbell and gave his date of birth.

At this point Officer Saxton had not told defendant he could not leave, and defendant had consented to speak with her. Officer Saxton had not restrained defendant's freedom to walk away. "[T]he encounter [was] consensual and no reasonable suspicion [was] required." *Bostick*, 501 U.S. at 434, 115 L. Ed. 2d at 398. Officer Saxton's actions and questions were well within the perimeters of permissive police questioning without implicating a person's Fourth Amendment protections.

After obtaining defendant's name, Officer Saxton asked him to "hold up" while she transmitted the information to the dispatcher. Assuming *arguendo* that Officer Saxton's telling defendant to "hold

**STATE v. CAMPBELL**

[359 N.C. 644 (2005)]

up and she would be back up with him" would have led a reasonable person to believe that under the circumstances he was not free to leave, we conclude that at that point Officer Saxton had a reasonable, articulable suspicion that defendant was engaged in criminal activity warranting further investigation. As this Court stated in *State v. Watkins*:

> Only unreasonable investigatory stops are unconstitutional. *Terry v. Ohio*. An investigatory stop must be justified by "a reasonable suspicion, based on objective facts, that the individual is involved in criminal activity." *Brown v. Texas*.

> A court must consider "the totality of the circumstances—the whole picture" in determining whether a reasonable suspicion to make an investigatory stop exists. *U.S. v. Cortez*. The stop must be based on specific and articulable facts, as well as the rational inferences from those facts, as viewed through the eyes of a reasonable, cautious officer, guided by his experience and training. *Terry*; *State v. Thompson* [1979 North Carolina Supreme Court decision]. The only requirement is a minimal level of objective justification, something more than an "unparticularized suspicion or hunch." *U.S. v. Sokolow*.

337 N.C. at 441-42, 446 S.E.2d at 70 (citations omitted).

The facts known to Officer Saxton were that she had received a complaint from a K-Mart employee about a suspicious person whose car was parked for a lengthy period in the parking lot. Defendant acknowledged that he had been parked in the lot. Defendant said he had completed a job in Columbia, South Carolina, that he was traveling home to North Carolina, and that he had stopped in Aiken to take a nap. Aiken is forty-five miles west of Columbia and is not on the route to North Carolina. The K-Mart was more than ten miles from the interstate connecting Columbia and Aiken. Defendant had no driver's license with him and did not know the name of his friend to whom the car belonged. These articulable facts were sufficient to give rise to a reasonable suspicion in the mind of a trained police officer that defendant was involved in criminal activity.

We conclude that defendant was not illegally seized in contravention of his constitutional rights. Therefore, the trial court did not err in denying defendant's motion to suppress. This assignment of error is overruled.

## JURY SELECTION

**[2]** Defendant next contends that the trial court improperly limited defendant's *voir dire* by refusing to allow defendant to ask prospective jurors whether, given that defendant had made a confession, defendant's election not to testify would adversely influence their decision. Defendant argues that by refusing to allow him to ask this question, the trial court deprived him of the right to a trial before a fair and impartial jury. We disagree.

Parties are not allowed to "stake out" a prospective juror's opinion based on specific facts. *State v. Mitchell*, 353 N.C. 309, 319, 543 S.E.2d 830, 837, *cert. denied*, 534 U.S. 1000, 151 L. Ed. 2d 389 (2001). Here, defendant inquired of a prospective juror as follows: "[I]f Mr. Campbell elects not to testify, knowing that fact alone, is that going to affect your decision, at this point?" The State's objection to this question was overruled, but the court then asked defense counsel to rephrase the question. Counsel then asked the prospective juror: "We want you to know that Mr. Campbell has made a statement, as I've already indicated. And the question I'm asking now is, knowing that, then would Mr. Campbell's failure to testify affect your decision making process in this case?" The trial court sustained the State's objection to this question.

In a criminal case a defendant is allowed to ask prospective jurors about their ability to follow the law. *State v. Bates*, 343 N.C. 564, 588, 473 S.E.2d 269, 282 (1996), *cert. denied*, 519 U.S. 1131, 136 L. Ed. 2d 873 (1997). Since a criminal defendant has a right not to testify, a defendant may properly inquire of jurors whether the defendant's decision not to testify would affect their ability to be fair and impartial. *Id.* In the instant case defendant was allowed to ask prospective jurors whether his decision not to testify would affect their impartiality. Jurors were properly instructed that defendant had a right not to testify. Furthermore, defendant was able to inquire of prospective jurors whether they would be able to follow the law. Viewing the *voir dire* in its entirety, we conclude that defendant had sufficient opportunity to examine prospective jurors on their ability to be fair and impartial in this trial and on their ability to render a decision without regard to defendant's failure to testify. The trial court did not err in limiting the question.

Defendant further asserts that the trial court's ruling violated his federal and state constitutional rights. However, defendant failed to assert these constitutional arguments before the trial court. Hence,

STATE v. CAMPBELL

[359 N.C. 644 (2005)]

these arguments are not properly before this Court for review. N.C. R. App. P. 10(b)(1); *State v. Anderson*, 350 N.C. 152, 175, 513 S.E.2d 296, 310, *cert. denied*, 528 U.S. 973, 145 L. Ed. 2d 326 (1999). This assignment of error is overruled.

[3] Next, defendant contends that the trial court erred in excusing prospective juror John West for cause. We disagree.

The trial court has broad discretion in overseeing *voir dire*, including the decision of whether to grant or deny a challenge for cause. *State v. Abraham*, 338 N.C. 315, 343, 451 S.E.2d 131, 145 (1994); *State v. Quick*, 329 N.C. 1, 17, 405 S.E.2d 179, 189 (1991). The standard of review is whether the trial judge abused his discretion and whether this abuse of discretion prejudiced the defendant. *Abraham*, 338 N.C. at 343-44, 451 S.E.2d at 145-46.

In this case the transcript reveals that Mr. West lived down the road from the victim, had known the victim his entire life, had been in the victim's home, and had attended the victim's funeral. The victim called Mr. West shortly before the murder to request a ride to get his car serviced. In addition Mr. West indicated that he would prefer "not . . . to look at pictures" and asked to be deferred. Under section 15A-1212 of the North Carolina General Statutes, a challenge for cause may be made to a juror if the juror "is unable to render a fair and impartial verdict." N.C.G.S. § 15A-1212(9) (2003). While Mr. West stated that he could set aside his personal feelings and be a fair and impartial juror, the trial judge was in a unique position to assess the prospective juror's impartiality and had ample reason to grant the challenge for cause. *State v. Dickens*, 346 N.C. 26, 42, 484 S.E.2d 553, 561 (1997). On this record defendant has failed to show an abuse of the trial court's discretion in granting the challenge for cause as to prospective juror John West.

Defendant's constitutional claims must also fail. Defendant failed to assert at trial that his constitutional rights were violated. Hence, these arguments are not properly before this Court for review. N.C. R. App. P. 10(b)(1); *Anderson*, 350 N.C. at 175, 513 S.E.2d at 310.

## GUILT-INNOCENCE PHASE

[4] In his next assignment of error, defendant contends that the trial court erred by overruling his objections to portions of the testimony of the State's expert witness, Robert Brown, M.D. Dr. Brown was certified by the trial court as an expert in the field of medicine, specifically forensic psychiatry. Defendant complains that Dr. Brown was

allowed to testify over defendant's objections about the meaning of locations of blood spatter in the victim's home. Defendant contends that the doctor was not qualified to interpret bloodstain pattern evidence and that his testimony based on the location of blood spatter in the victim's home was improperly allowed, thereby violating defendant's constitutional rights and requiring a new trial. For the following reasons, we disagree.

Expert testimony is admissible "[i]f scientific, technical or other specialized knowledge will assist the trier of fact to understand the evidence or to determine a fact in issue." N.C.G.S. § 8C-1, Rule 702(a) (2003). In determining the admissibility of expert opinion, we consider "whether the opinion expressed is really one based on the special expertise of the expert, that is, whether the witness because of his expertise is in a better position to have an opinion on the subject than is the trier of fact." *State v. Wilkerson*, 295 N.C. 559, 568-69, 247 S.E.2d 905, 911 (1978); *see also State v. Gainey*, 355 N.C. 73, 88, 558 S.E.2d 463, 474, *cert. denied*, 537 U.S. 896, 154 L. Ed. 2d 165 (2002). The trial court has broad discretion in determining whether to admit the testimony of an expert. *Gainey*, 355 N.C. at 88, 558 S.E.2d at 474.

Arguing that Dr. Brown was not qualified to testify as an expert in blood spatter interpretation, defendant asserts that Dr. Brown should not have been allowed to testify about the implications of the SBI blood spatter report or of the location of blood spatter and smears at the crime scene. Defendant points to five portions of the doctor's testimony as constituting inadmissible testimony: (i) that the attack on the victim occurred in two different areas of the residence; (ii) that two areas of attack suggested intent on defendant's part; (iii) that two areas of attack were inconsistent with acting in a state of panic; (iv) that the victim's being attacked while lying prone on the floor was consistent with specific intent to kill; and (v) that the location of certain bloodied items in two different rooms of the house demonstrated that defendant had not panicked but had walked through the house after the attack. We address each of these issues in turn.

Defendant first points to the following testimony as being inadmissible:

Q. Are you aware that there was a pool of blood on the couch?

A. Yes.

Q. Were you also aware that there was a pool of blood on the floor?

A. Yes.

Q. Did you read Dennis Honeycutt's report?

A. Yes.

Q. Did you use that to help form your opinions as whether or not there were two areas of attack in this house?

MR. HECKART: Objection, Your Honor.

THE COURT: Overruled.

THE WITNESS: It seemed to me, based upon the report and what I saw with my own eyes, that there were two locations of the attack.

Having been qualified as an expert, Dr. Brown was entitled to testify as to information and data on which he relied to form his expert opinion regarding whether defendant acted in a state of panic. *State v. Jones*, 358 N.C. 330, 348, 595 S.E.2d 124, 136, *cert. denied*, —— U.S. ——, 160 L. Ed. 2d 500 (2004). Shortly before this testimony, Dr. Brown testified that "[i]f the forensic evidence indicates that there was only one location where blows were delivered to the head of the victim, that means one thing; if there were two locations, that tends to mean another thing. Two locations means less chance of panic, at least, in my opinion." Thus, Dr. Brown's testimony, which defendant now argues was inadmissible, showed the basis for Dr. Brown's determination concerning defendant's behavior at the time of the crime. Dr. Brown was not interpreting blood spatter but rather expressing his conclusions as to defendant's mental state based in part on the blood spatter expert's report.

The SBI report was later described in detail by witness Special Agent Dennis Honeycutt. Agent Honeycutt described the same two areas where a large amount of blood was found, the couch and an area on the floor where the victim was found. Agent Honeycutt testified that the amount of blood on the couch suggested that the victim spent some time on the couch before moving to the floor. Therefore, defendant's contention on this issue has no merit.

Defendant also argues error occurred in this exchange:

Q. Is it consistent, the evidence, physical evidence, consistent with the specific intent to kill?

A. Well, it's my testimony that two locations of assault is suggestive more so of intent—

MR. HECKART: I'm going to object Your Honor.

THE WITNESS: —than.

MR. HECKART: I don't think that's in evidence.

THE COURT: Overruled. Continue.

THE WITNESS: Than otherwise.

THE COURT: Overruled.

Defendant argues that Dr. Brown should not have been allowed to testify that two areas of attack suggested intent. Dr. Brown testified that he had studied panic disorders, and he was accepted by the trial court as an expert in forensic psychiatry. As such Dr. Brown was competent to evaluate the evidence and to give an opinion as to what defendant's mental state might have been at the time of the crime. Moreover, defendant's objection was based on the two locations of assault not being in evidence. As noted earlier, Dr. Brown relied on the SBI report, and that report was admitted into evidence as part of Dennis Honeycutt's testimony. We conclude that the testimony was not improperly allowed. Defendant's contention is without merit.

[5] Next, defendant asserts that Dr. Brown should not have been allowed to testify that the existence of two areas of attack was inconsistent with defendant's being panicked:

Q. Is that inconsistent with a panic state?

A. It tends to be somewhat inconsistent with a panic state if, if the goal of the panic is to escape. If the goal of the panic is to escape, then escape becomes paramount.

Defendant did not object to this testimony at trial and, thus, did not preserve this issue for appeal pursuant to N.C. R. App. P. 10(b)(1). Accordingly, this issue is not properly before this Court.

[6] Defendant next complains that Dr. Brown should not have been allowed to give his opinion as to defendant's state of mind based on the fact that the victim was found lying prone on the floor. The prosecutor asked Dr. Brown, "Assuming that the victim, Buddy Hall, is laying [sic] on the floor of his own home for at least one of those blows being dealt, is that also consistent with the specific intent to kill?" Dr. Brown was given a specific fact and asked if it suggested

intent on the part of defendant. As a psychiatrist, Dr. Brown is trained to recognize links between behavior and a person's state of mind. Therefore, Dr. Brown had "specialized knowledge [to] assist the trier of fact to understand the evidence or to determine a fact in issue." N.C.G.S. § 8C-1, Rule 702(a). We hold that this testimony was not improperly allowed.

[7] Finally, defendant points to the following exchange regarding the bloody towel and pillowcase:

> Q. How about with respect to the bloody towel on the love seat and the bloody pillow case in the bedroom, can you please explain why that's significant?
>
> A. It speaks less of panic and more of other things.
>
> Q. Such as?
>
> A. Such as walking around the house.

Defendant did not object to this exchange at trial and, thus, has failed to preserve this issue for appeal. N.C. R. App. P. 10(b)(1). Therefore, this issue is not properly before this Court for review.

[8] Defendant also contends that the inclusion of these portions of the doctor's testimony violated his federal and state constitutional rights. Defendant did not raise these constitutional issues at trial and has, therefore, failed to preserve them on appeal. N.C. R. App. P. 10(b)(1); *State v. Call*, 349 N.C. 382, 410, 508 S.E.2d 496, 514 (1998), *cert. denied*, 534 U.S. 1046, 151 L. Ed. 2d 548 (2001). This assignment of error is overruled.

[9] Defendant next contends that the trial court erred by excluding testimony regarding an alleged prior violent sexual act by the victim. Defendant's argument at trial for allowing this testimony was that it would show that the victim was the first aggressor in the incident leading up to his death. On *voir dire* the defense proffered the testimony of two witnesses, Ramona Gore and Michael Wilson, who testified about an incident that occurred before the murder for which defendant was charged. The witnesses, who lived in the same neighborhood as the victim, testified that an unknown man who knocked on their doors late at night claimed that the victim attempted to rape him.

The trial court ruled that the testimony was not relevant and was, hence, inadmissible until defendant introduced substantive evidence

of self-defense or evidence that the victim was the first aggressor. The trial court left open the possibility of introducing the evidence once relevancy had been shown. Rule 401 of the North Carolina Rules of Evidence defines "relevant evidence" as "evidence having any tendency to make the existence of any fact that is of consequence to the determination of the action more probable or less probable than it would be without the evidence." N.C.G.S. § 8C-1, Rule 401 (2003). Defendant had not offered any evidence of self-defense at the time he attempted to introduce this particular testimony of Ramona Gore and Michael Wilson. Thus, that an unidentified man accused the victim of assault several years before the crime for which defendant was charged took place did not make any fact in the case more probable or less probable. The trial court's ruling was not in error.

Defendant now contends that the testimony was independently admissible to impeach the testimony of Deborah McAllister, who stated that she had never known the victim to be violent. However, defendant failed to make this argument at trial and cannot now advance a different theory on appeal. N.C. R. App. P. 10(b)(1); *see State v. Hamilton*, 351 N.C. 14, 22, 519 S.E.2d 514, 519 (1999), *cert. denied*, 529 U.S. 1102, 146 L. Ed. 2d 783 (2000). Since the trial court's ruling was proper under the theory defendant advocated at trial, this assignment of error is overruled.

**[10]** Next, defendant contends that the trial court erred in refusing to allow defendant to cross-examine witnesses and by sustaining the State's objections to questions regarding sexual paraphernalia found in the victim's home. Defendant argues that the State opened the door to this evidence through witness testimony about other items found in the victim's home. Although not expressly stated, defendant appears to be asserting that the disallowed questions were relevant to determining the thoroughness of the State's investigation of the crime scene. Finally, defendant asserts that he should have been allowed to conduct a redirect examination of Dr. Corvin regarding the items at issue, which, according to defendant, would have bolstered Dr. Corvin's credibility regarding his diagnosis of diminished capacity. Defendant contends that as a result of the trial court's ruling, the defense was unable to respond to the prosecution's attack on Dr. Corvin on cross-examination which belittled him for his failure to examine certain items of physical evidence in the case. Defendant argues that the trial court's errors resulted in the presentation of an inaccurate picture of the victim to the jury. We disagree.

The State elicited testimony from witnesses Deborah McAllister, SBI Agent Hans Miller, and Detective Kevin Kemp regarding various items found in the victim's house and where those items were located. Ms. McAllister testified about the location of the victim's boom box, wallet, rolls of coins, and mallet. Defendant asked the trial judge for permission to ask Ms. McAllister on ·cross-examination about the presence of certain items in the house, such as douche bottles. The trial court denied the request based on Rule 403 of the Rules of Evidence, but permitted defendant to ask Ms. McAllister about the victim's drinking habits and her knowledge of any pornographic videotapes in the house.

Defendant also asked the trial judge for permission to inquire about sexual paraphernalia after Detective Kemp testified about items he found and seized in the victim's home. Detective Kemp testified about coins, coin wrappers, and a pair of men's trousers. On cross-examination Detective Kemp testified that although he saw a jar of Vaseline and a condom by the bed, he did not initially seize those, as he did not deem them relevant to the investigation. Later Detective Kemp did go back to seize those items. Moreover, a storage room had not been examined carefully in the initial investigation of the house; but police eventually seized items, such as pornographic tapes and ammunition, from that room. Defendant sought to inquire about the seizure of a paper bag found in the storage room which contained a used condom, a douche bottle, lubricant, boxes of condoms, and a towel. Testing of the used condom by the defense revealed that the condom contained the sperm of three different men, although none were a match for defendant. When defendant sought permission to cross-examine Detective Kemp about the paper bag and its contents, the trial judge ruled that the items were irrelevant or highly prejudicial.

The general rule regarding admission of evidence is that "[a]ll relevant evidence is admissible, except as otherwise provided by the Constitution of the United States, by the Constitution of North Carolina, by Act of Congress, by Act of the General Assembly, or by [the Rules of Evidence]." N.C.G.S. § 8C-1, Rule 402 (2003). The Rules of Evidence define relevant evidence as "evidence having any tendency to make the existence of any fact that is of consequence to the determination of the action more probable or less probable than it would be without the evidence." *Id.*, Rule 401. Further, "[a]lthough relevant, evidence may be excluded if its probative value is substantially outweighed by the danger of unfair prejudice, confu-

sion of the issues, or misleading the jury, or by considerations of undue delay, waste of time, or needless presentation of cumulative evidence." *Id.*, Rule 403 (2003). The decision whether to exclude evidence under Rule 403 of the Rules of Evidence is within the discretion of the trial court and will not be overturned absent an abuse of discretion. *See State v. Williams*, 334 N.C. 440, 460, 434 S.E.2d 588, 600 (1993), *judgment vacated on other grounds sub nom. North Carolina v. Bryant*, 511 U.S. 1001, 128 L. Ed. 2d 42 (1994), *and cert. denied*, 516 U.S. 833, 133 L. Ed. 2d 61 (1995); *State v. Hennis*, 323 N.C. 279, 285, 372 S.E.2d 523, 527 (1988). "Abuse of discretion results where the court's ruling is manifestly unsupported by reason or is so arbitrary that it could not have been the result of a reasoned decision." *Hennis*, 323 N.C. at 285, 372 S.E.2d at 527.

Here, the trial court was acting within its discretion in excluding this evidence as irrelevant. The trial court acted within its discretion in ruling that defendant could not inquire of Ms. McAllister about the sexual paraphernalia in that "its probative value [was] substantially outweighed by the danger of unfair prejudice." N.C.G.S. § 8C-1, Rule 403. As for the cross-examination of Detective Kemp, defense counsel at trial argued that the purpose of the disallowed questions was to impeach Detective Kemp by showing that the investigation was not thorough. However, as the trial judge noted, the identity of the murderer was not at issue, and, thus, the used condom found in a bag in the storage room had no bearing on the fact of the murder itself. Defendant has made no showing of how this evidence was relevant or how the trial court abused its discretion in disallowing cross-examination about these items. The trial court properly concluded that the questions did not have "any tendency to make the existence of any fact that is of consequence to the determination of the action more probable or less probable than it would be without the evidence." *Id.*, Rule 401.

Defendant also argues that he should have been allowed to conduct redirect examination of Dr. Corvin regarding the sexual paraphernalia because the doctor's credibility hinged on whether his diagnosis was supported by physical evidence. Defendant argues that the admission of evidence about the sexual paraphernalia would lend support to defendant's claim that the victim made a homosexual advance on him. However, defendant's attempt to show that the victim was homosexual does not prove that the victim was the first aggressor. If the evidence had been allowed, "it would have added little to the proof of this fact and could have been very inflammatory

and unfairly prejudicial." *State v. Lovin,* 339 N.C. 695, 706, 454 S.E.2d 229, 236 (1995). Thus, even if relevant, exclusion of the evidence would have been proper pursuant to Rule 403. Similarly, defendant's argument that the State opened the door to this questioning by asking Dr. Corvin if he had examined the physical evidence admitted at trial is without merit. Questioning about the specific sexual paraphernalia would not have explained or rebutted evidence adduced by the State on cross-examination of Dr. Corvin. *See State v. Dale,* 343 N.C. 71, 76, 468 S.E.2d 39, 42 (1996). The trial court did not abuse its discretion in refusing to allow this testimony.

Further, defendant argues that the trial court deprived him of his constitutional rights by refusing to allow cross-examination regarding these items. This constitutional issue was not raised at trial and, therefore, the trial court did not have the opportunity to rule on it. Hence, these arguments are not properly before this Court for review. N.C. R. App. P. 10(b)(1); *Anderson,* 350 N.C. at 175, 513 S.E.2d at 310. This assignment of error is overruled.

[11] Defendant also assigns error to the trial court's refusal to restrict how the prosecution made reference to the victim's tapestry depicting the Biblical scene, "The Last Supper." The tapestry hung on the wall over the victim's couch, and blood was found spattered on it. Defendant argued at trial that witnesses and the prosecution should be required to refer to the tapestry as simply "the tapestry" without naming it as "the Last Supper tapestry." Defendant contends specifically that references to the Last Supper were highly prejudicial in that they had the potential to inflame the jury by referring to the presence of blood on a religious article. The trial court ruled that the tapestry could be referred to as "the Last Supper tapestry."

Evidence that is otherwise relevant "may be excluded if its probative value is substantially outweighed by the danger of unfair prejudice." N.C.G.S. § 8C-1, Rule 403. "Whether or not to exclude evidence under Rule 403 of the Rules of Evidence is a matter within the sound discretion of the trial court and its decision will not be disturbed on appeal absent a showing of an abuse of discretion." *State v. McCray,* 342 N.C. 123, 131, 463 S.E.2d 176, 181 (1995). "A trial court may be reversed for an abuse of discretion only upon a showing that its ruling was so arbitrary that it could not have been the result of a reasoned decision." *State v. Hayes,* 314 N.C. 460, 471, 334 S.E.2d 741, 747 (1985).

Defendant has not shown that the trial court abused its discretion in this matter. The trial court stated that, "I don't see any way, when

they're trying to describe the scene, how—they've got to be able to describe where the blood ended up." Description of a crime scene, although necessarily prejudicial to a defendant, is not so unfairly prejudicial as to outweigh its probative value in helping jurors and the court understand how and where the crime took place. Therefore, the use of the descriptive term, "the Last Supper tapestry," by witnesses and the prosecution was proper; and the trial court did not abuse its discretion by so ruling. Nothing in the record suggests that the description was used excessively and solely to inflame the passions and prejudices of the jury against defendant. As a result the trial court's ruling was not "so arbitrary that it could not have been the result of a reasoned decision." *Id.*

Defendant also argues that the trial court's ruling deprived him of his constitutional rights. Defendant did not argue the constitutional issue at trial and, thus, has not preserved the arguments for appellate review. N.C. R. App. P. 10(b)(1); *Call*, 349 N.C. at 410, 508 S.E.2d at 514. Defendant's assignment of error is overruled.

**[12]** Defendant next contends that the trial court erred by failing to intervene *ex mero motu* during the State's closing argument upon hearing the prosecutor argue that defendant was attempting to rob the K-Mart in Aiken, South Carolina. Defendant moved before trial for disclosure of 404(b) "other crimes" evidence that the State planned to offer. The State was unable to respond, and the trial court directed the prosecutor to approach the bench before eliciting 404(b) evidence. Defendant now argues that the prosecutor improperly elicited Rule 404(b) evidence by introducing two witnesses who testified as to defendant's actions in front of the K-Mart store in Aiken, South Carolina. The State argued in closing that defendant was "staking out" the store and that this conduct constituted evidence which could be considered in determining premeditation, deliberation, or intent to rob. The section of the closing about which defendant complains is as follows:

> Let's go after now. Staking out a K-Mart. What was he doing? Is it too far of a leap to say that he was bent on robbing that place when he had $5.31 in a brown bag, and whatever change is in this one? What's he going to do next? What's his next move? Oh, thank goodness, the police? Huh-uh. No way. He's on the run now, and that's going to cost you. Keep in mind, that's a long drive. He is spending Buddy's money along the way and maybe Guy's too, that's why these wallets are empty, but he's getting low on cash now, and he got made 10 minutes before closing, damn stock boy.

**STATE v. CAMPBELL**

[359 N.C. 644 (2005)]

We note first that defendant did not object to this argument at trial. Defendant must, therefore, show that the prosecutor's argument was "so grossly improper that the trial court abused its discretion by failing to intervene *ex mero motu*." *State v. Davis*, 349 N.C. 1, 23, 506 S.E.2d 455, 467 (1998), *cert. denied*, 526 U.S. 1161, 144 L. Ed. 2d 219 (1999). To make this showing, defendant must demonstrate "that the prosecutor's comments so infected the trial with unfairness that they rendered the conviction fundamentally unfair." *Id.* (citing *State v. Rose*, 339 N.C. 172, 202, 451 S.E.2d 211, 228-29 (1994), *cert. denied*, 515 U.S. 1135, 132 L. Ed. 2d 818 (1995)). A prosecutor is allowed "to argue all the facts submitted into evidence as well as any reasonable inferences therefrom." *State v. Gregory*, 340 N.C. 365, 424, 459 S.E.2d 638, 672 (1995), *cert. denied*, 517 U.S. 1108, 134 L. Ed. 2d 478 (1996).

The comments by the prosecutor suggesting that defendant intended to rob the K-Mart were not so grossly improper as to require intervention *ex mero motu* by the trial court. The evidence showed that defendant had stolen items from the victim, including the victim's car and wallet containing the victim's identification. Defendant then sat for several hours in the parked car in front of the K-Mart until a few minutes before time for the store to close. Defendant did not leave the car during this time. Defendant also possessed another stolen wallet containing an identification card. The actions of defendant in this time period were certainly subject to suspicion. The prosecutor could, therefore, reasonably argue the inference from this evidence that defendant was staking out the store in order to rob it. Moreover, contrary to defendant's assertion, defense counsel was not taken by surprise with this argument, as the prosecutor had signaled this argument during the charge conference. We conclude that the trial court did not abuse its discretion by not intervening *ex mero motu* when the State made this argument.

Additionally, defendant contends that this error violated his federal and state constitutional rights, but defendant failed to assert these constitutional arguments before the trial court. Hence, these arguments are not properly before this Court for review. N.C. R. App. P. 10(b)(1); *Anderson*, 350 N.C. at 175, 513 S.E.2d at 310. This assignment of error is overruled.

**[13]** Next, defendant contends that the trial court erred by failing to intervene *ex mero motu* during the portion of the State's closing argument that attacked the expert testimony of defendant's expert wit-

STATE v. CAMPBELL

[359 N.C. 644 (2005)]

ness, Dr. Corvin. Defendant specifically argues that the prosecutor improperly implied that Dr. Corvin gave answers that would help defendant because he was paid by the defense. Additionally, defendant contends that the prosecutor misstated evidence while attempting to discredit Dr. Corvin in closing argument. We disagree.

Defendant directs our attention to the following portion of the State's closing argument relating to Dr. Corvin's testimony that defendant was unable to form specific intent and to certain language in the Diagnostic and Statistical Manual-IV: "Well, Doctor, don't they say you can't do that? Don't your own colleagues say you can't do that. Yes, but they're not paying my bill. That's what he wanted to say. They are. (Indicating.)" Defendant also challenges this statement: "Enter Dr. Corvin. The best witness—well, I'm not going to say that. A witness that the defendant could buy." Finally, defendant points out this passage, in which the prosecutor argues:

> [As defendant:] Well, Doctor, can't you do something? We're paying good money for this.
>
> [As Dr. Corvin:] Yes. Let me think out of the box. Let me just—all right, I got it, I got it. Go with me now, go with me. I'm a doctor, we all agree, I'm a doctor.
>
> MR. HECKART:  Your Honor—
>
> THE COURT:  Overruled.
>
> MR. DAVID:  Let me repeat that. He's a doctor. He's a doctor. So the first thing is, twinkies defense, hyperthyroidism. That's something, that's medical, they're not going to know what that means. A Pender jury? I'm s[m]arter than them, coming from Raleigh.

The prosecutor continued regarding Dr. Corvin's assessment of defendant's alcohol abuse, stating that whether defendant was in denial "depends [on] if the evidence hurts us or helps us."

We conclude that the prosecutor's statements about Dr. Corvin's credibility were not grossly improper. Generally speaking, "it is not improper for the prosecutor to impeach the credibility of an expert during his closing argument." *State v. Norwood*, 344 N.C. 511, 536, 476 S.E.2d 349, 361 (1996), *cert. denied*, 520 U.S. 1158, 137 L. Ed. 2d 500 (1997). More specifically, though, this Court has recently considered this issue in depth in *State v. Rogers*, 355 N.C. 420, 462-64, 562 S.E.2d 859, 885-86 (2002). We noted there that:

**STATE v. CAMPBELL**

[359 N.C. 644 (2005)]

> it is proper for a party to point out potential bias resulting from payment that a witness received or would receive for his or her services. However, where an advocate has gone beyond merely pointing out that the witness' compensation may be a source of bias to insinuate that the witness would perjure himself or herself for pay, we have expressed our unease while showing deference to the trial court.

*Id.* at 462-63, 562 S.E.2d at 885 (citation omitted). In *Rogers*, we concluded that a statement arguing that the defendant's expert witness would say anything in order to be paid, although improper, was not so grossly improper that the trial court was required to intervene *ex mero motu*. *Id.* at 464, 562 S.E.2d at 886.

Although the comment that Dr. Corvin was "[a] witness that the defendant could buy" verges on being unacceptable, we conclude that the trial court was not required to intervene *ex mero motu* as to any of the statements highlighted by defendant. We note, moreover, that in his closing argument preceding the State's closing argument, defense counsel used this same tactic in an attempt to discredit the State's mental health expert.

Finally, observing that this case was tried before our opinion in *Rogers* was issued, we reemphasize the admonition in *Rogers* that counsel should "refrain from arguing that a witness is lying solely on the basis that the witness has been or will be compensated for his or her services." *Id.*

Defendant also contends that the prosecutor misstated portions of Dr. Corvin's testimony in the following passage:

> *What else do we have? Defendant's actions. Well, in my opinion, words speak louder than actions. I don't see why you need to look at them.* Well, let's look at the defendant's actions before, during and after this murder because, actually, that's what the law is, Doctor. The law on premeditation and deliberation says you are to take into account the defendant's actions before a murder, during a murder, and after a murder. He said, I do find the 48 hours preceding the murder to be relevant.

(Emphasis added.) The cross-examination of Dr. Corvin to which this passage refers was as follows:

> Q. In fact, wouldn't you agree with me, Doctor, that actions speak louder than words?

A. Now, that's a common saying, but I don't think it's always accurate.

Q. You wouldn't agree with that?

A. Actions are important. The facts of what happens are critical, but that, in and of itself, does not define the state of mind.

When viewed in context, this argument is not grossly improper. The essence of the prosecutor's argument was that Dr. Corvin's assessment of defendant's mental state did not necessarily take into account all of defendant's actions surrounding the murder. Moreover, the jury was instructed by the trial court "to rely solely upon your recollection of the evidence in your deliberations." *See Gregory*, 340 N.C. at 408, 459 S.E.2d at 662-63 (holding that jurors were presumed to follow instructions similar to those in the instant case). Thus, even if the comments were improper, the jury instructions informed the jury not to rely on the closing arguments as their guide in evaluating the evidence. Viewed as a whole, and in light of the wide latitude afforded the prosecution in closing argument, the prosecutor's challenged arguments did not so infuse the proceeding with impropriety as to impede defendant's right to a fair trial. *See State v. Harris*, 308 N.C. 159, 169, 301 S.E.2d 91, 98 (1983). This assignment of error is overruled.

[14] In his next assignment of error, defendant contends that the trial court erred in overruling his objection to that portion of the prosecutor's closing argument that alluded to defendant's failure to testify. Defendant asserts the following statements constituted improper comment on his decision not to testify:

> We were talking about speculation and conjecture. We kept talking about this defendant's statement at an early stage. Do you realize this isn't even evidence? Evidence comes from the witness stand, ladies and gentlemen. It's when people are under oath and are subject to cross-examination.

> [DEFENSE COUNSEL]: Objection, Your Honor.

> THE COURT: Overruled.

> [PROSECUTOR]: Are you listening to me? Evidence comes from right here. (Indicating.) Isn't that what we talked about, under oath, subject to cross-examination. This is self-serving hearsay, and it can't even be considered as substantive evidence.

Defendant argues that prejudice may be shown by the trial court's failure to give a curative instruction informing the jury that defendant has the right not to testify. Defendant also contends that the prosecutor's comment that the confession "isn't even evidence" ignored the use for which the confession was admitted, that is, to aid the jury in weighing Dr. Corvin's credibility. Defendant contends such errors constituted prejudicial error. We disagree.

A defendant has the right not to testify under the Fifth Amendment to the United States Constitution, as applied to the states by the Fourteenth Amendment, *Griffin v. California*, 380 U.S. 609, 615, 14 L. Ed. 2d 106, 110 (1965), and under Article I, Section 23 of the North Carolina Constitution, *State v. Reid*, 334 N.C. 551, 554, 434 S.E.2d 193, 196 (1993). A defendant's exercise of this right may not be used against him, and any reference by the State to a defendant's failure to testify violates that defendant's constitutional rights. *State v. Miller*, 357 N.C. 583, 589, 588 S.E.2d 857, 862 (2003), *cert. denied*, —— U.S. ——, 159 L. Ed. 2d 819 (2004). A statement that may be interpreted as commenting on a defendant's decision not to testify is improper if " 'the jury would naturally and necessarily take it to be a comment on the failure of the accused to testify.' " *State v. Rouse*, 339 N.C. 59, 95-96, 451 S.E.2d 543, 563 (1994), *cert. denied*, 516 U.S. 832, 133 L. Ed. 2d 60 (1995) (quoting *United States v. Anderson*, 481 F.2d 685, 701 (4th Cir. 1973), *aff'd*, 417 U.S. 211, 41 L. Ed. 2d 20 (1974)). However, in closing argument, the prosecutor "may properly bring to the jury's attention the failure of a defendant to produce exculpatory evidence or to contradict evidence presented by the State." *State v. Parker*, 350 N.C. 411, 431, 516 S.E.2d 106, 120 (1999), *cert. denied*, 528 U.S. 1084, 145 L. Ed. 2d 681 (2000). This Court also held in *State v. Miller*, 357 N.C. at 588-89, 588 S.E.2d at 862, that the prosecutor's statement that the " 'defendant's version of the facts . . . is not in evidence' " was not a comment on the defendant's failure to testify, but rather a comment on "a weakness in defendant's theory of the case."

In the case at bar, the prosecutor's statement was not an improper comment on defendant's failure to testify. The prosecutor was reminding the jury that the confession was not admitted as substantive evidence and could not be used for that purpose. The statement was admitted for the limited purpose of allowing the jury to weigh the credibility of Dr. Corvin's testimony, since Dr. Corvin stated that he based his opinion on, among other things, defendant's thirteen page written confession. The prosecutor was entitled to point out that the statement was not evidence that could be consid-

ered on a par with testimonial evidence given by a witness from the stand. Therefore, we conclude that the prosecutor's comments were not improper and that the trial court did not err in overruling defendant's objection.

Defendant additionally argues that the trial court's failure to sustain the objection violated his constitutional rights. However, defendant failed to assert these constitutional arguments before the trial court. Hence, these arguments are not properly before this Court for review. N.C. R. App. P. 10(b)(1); *Anderson*, 350 N.C. at 175, 513 S.E.2d at 310. This assignment of error is overruled.

**[15]** Defendant next assigns error to the trial court's failure to dismiss the felony murder charge for lack of sufficient evidence. Defendant argues that since the robbery of the victim and the murder were not one continuous transaction, the robbery could not serve as the underlying felony for the charge of felony murder. Thus, according to defendant, the trial court erred by denying his motion to dismiss and also violated his constitutional rights by submitting the (e)(5) aggravating circumstance that the "capital felony was committed while the defendant was engaged . . . in the commission of . . . robbery." N.C.G.S. § 15A-2000(e)(5) (2003). We disagree.

In *State v. Trull*, discussing the test for deciding a motion to dismiss, this Court stated:

> When determining the sufficiency of the evidence to support a charged offense, we must view the evidence "in the light most favorable to the State, giving the State the benefit of all reasonable inferences." *State v. Benson*, 331 N.C. 537, 544, 417 S.E.2d 756, 761 (1992). A defendant's motion to dismiss must be denied if the evidence considered in the light most favorable to the State permits a rational jury to find beyond a reasonable doubt the existence of each element of the charged crime and that defendant was the perpetrator. *See State v. Williams*, 334 N.C. at 447, 434 S.E.2d at 592.

> Whether the evidence presented is direct or circumstantial or both, the test for sufficiency is the same. *State v. Vause*, 328 N.C. 231, 237, 400 S.E.2d 57, 61 (1991); *State v. Bullard*, 312 N.C. 129, 160, 322 S.E.2d 370, 388 (1984). "Circumstantial evidence may withstand a motion to dismiss and support a conviction even when the evidence does not rule out every hypothesis of innocence." *State v. Stone*, 323 N.C. 447, 452, 373 S.E.2d 430, 433

(1988). If the evidence supports a reasonable inference of defendant's guilt based on the circumstances, then "it is for the [jurors] to decide whether the facts, taken singly or in combination, satisfy them beyond a reasonable doubt that the defendant is actually guilty." *State v. Rowland*, 263 N.C. 353, 358, 139 S.E.2d 661, 665 (1965).

*State v. Trull*, 349 N.C. 428, 447, 509 S.E.2d 178, 191 (1998), *cert. denied*, 528 U.S. 835, 145 L. Ed. 2d 80 (1999). This Court has also held that "evidence is sufficient to support a charge of felony murder based on the underlying offense of armed robbery where the jury may reasonably infer that the killing and the taking of the victim's property were part of one continuous chain of events" and that "whether the intention to commit the taking of the victim's property was formed before or after the killing" is immaterial. *State v. Handy*, 331 N.C. 515, 529, 419 S.E.2d 545, 552 (1992). The critical factor is that there be "no break in the chain of events between the taking of the victim's property and the force causing the victim's death, so that the taking and the homicide are part of the same series of events, forming one continuous transaction." *Id.* The robbery may take place before or after the murder. *State v. Barden*, 356 N.C. 316, 352-53, 572 S.E.2d 108, 132 (2002), *cert. denied*, 538 U.S. 1040, 155 L. Ed. 2d 1074 (2003). Based on this precedent, the robbery may serve as the underlying felony for felony murder as long as the murder and the robbery form a continuous chain of events.

Applying these principles of law and viewing the evidence in the light most favorable to the State, we hold that the State's evidence was sufficient to support the felony murder charge based on robbery with a dangerous weapon in this case. The State's evidence showed defendant and the victim together on a store surveillance videotape on the night of 2 February 2000. The next evening, 3 February 2000, defendant was in possession of the victim's car, wallet, boom box, and other personal property. The State's evidence also showed that the victim kept his wallet in the pocket of his trousers and his boom box in the house. DNA evidence placed defendant at the victim's home, and the victim's blood was found on defendant's trousers. That the majority of the evidence is circumstantial is not dispositive. *Trull*, 349 N.C. at 447, 509 S.E.2d at 191. Although the exact details of the murder and robbery are lacking, the evidence, taken in the light most favorable to the State, permits a reasonable juror to infer that defendant murdered and robbed the victim without any break in the series of events.

Defendant further argues that the trial court's error violated his constitutional rights. Defendant did not raise this constitutional issue at trial; consequently, the trial court did not have the opportunity to consider or rule on this issue. N.C. R. App. P. 10(b)(1). Defendant has accordingly failed to preserve this assignment of error for appellate review. *See State v. Fullwood*, 343 N.C. 725, 733, 472 S.E.2d 883, 887 (1996), *cert. denied*, 520 U.S. 1122, 137 L. Ed. 2d 339 (1997) (holding that defendant failed to raise a constitutional issue at trial and thus failed to preserve the issue for appellate review). This assignment of error is overruled.

## SENTENCING PROCEEDING

[16] Next, defendant contends that the trial court erred by not allowing two witnesses to testify at sentencing regarding a prior violent sexual act by the victim. Although we have considered the exclusion of this evidence in the guilt phase and determined that the trial court's ruling was proper, defendant argues that the Rules of Evidence do not apply in the sentencing hearing. Accordingly, the witnesses should have been allowed to testify about this event. We disagree.

"Admissibility of evidence at a capital sentencing proceeding is not subject to a strict application of the rules of evidence, but depends on the reliability and relevance of the proffered evidence." *State v. Atkins*, 349 N.C. 62, 77, 505 S.E.2d 97, 107 (1998), *cert. denied*, 526 U.S. 1147, 143 L. Ed. 2d 1036 (1999); *see also State v. Strickland*, 346 N.C. 443, 460-61, 488 S.E.2d 194, 205 (1997), *cert. denied*, 522 U.S. 1078, 139 L. Ed. 2d 757 (1998). In the instant case, an analysis of defendant's purpose for offering the evidence, whether that purpose was satisfied, and the reliability of the evidence excluded will determine if the exclusion was proper.

The State introduced witnesses who testified that the victim was not violent and was not known to be violent. Defendant attempted to rebut this evidence with the testimony of witnesses Ramona Gore and Michael Wilson, who would have stated that one night an unknown man knocked on their doors, claiming that the victim attempted to rape him. The trial court conducted a lengthy *voir dire* of these witnesses. Both witnesses testified about the incident, which occurred several years before the murder involved in this case. After hearing the two witnesses, the trial court ruled that the State opened the door for evidence concerning the victim's reputation and character. However, the trial court limited defendant's rebuttal to testimony

STATE v. CAMPBELL

[359 N.C. 644 (2005)]

regarding the victim's reputation in the community. The trial court held specifically that defendant could not introduce evidence of the incident of the unknown man who knocked on the witnesses' doors late at night claiming an attempted rape.

In the presence of the jury, both witnesses testified as to the victim's reputation in the community for picking up younger men, bringing them back to his house, and attempting to have sex with them against their will. Although the specific incident was excluded from evidence, defendant was still able to rebut the State's evidence by introducing evidence of the victim's reputation for making unwanted sexual advances on men. The vagueness of the specific incident, including particularly that the man in question was unidentified, undermined the reliability of that evidence. Defendant has not demonstrated why exclusion of this evidence was improper. Further, even assuming that the evidence was improperly excluded, defendant was able to rebut the State's evidence and was not prejudiced as a result. This assignment of error is overruled.

[17] Defendant next complains that the trial court erred, abused its discretion, or committed plain error in admitting evidence of the circumstances surrounding defendant's 1985 conviction for kidnapping. The trial court denied defendant's motion *in limine* to exclude the circumstances of the kidnapping—in particular details of rapes allegedly committed by defendant—and allowed the State to introduce the circumstances of the kidnapping in order to prove the (e)(3) aggravating circumstance that defendant was previously convicted of a felony involving the use or threat of violence. Defendant contends that evidence of the alleged rapes should have been excluded and that the prosecutor should not have been allowed to argue that the alleged acts did not constitute rape in 1985 but would be considered so under current law. Defendant claims such evidence and arguments constituted improper evidence of bad character that unfairly prejudiced him and provided the jury with an improper basis for returning a verdict of death. For the following reasons, we disagree.

The State has the burden of proving beyond a reasonable doubt that an aggravating circumstance exists. *See* N.C.G.S. § 15A-2000(c)(1) (2003). Here, the State submitted the aggravating circumstance that defendant "had been previously convicted of a felony involving the use or threat of violence." *Id.* § 15A-2000(e)(3) (2003). This Court has stated that the "preferred method for proving a prior conviction" is to introduce the judgment. *State v. Maynard*, 311 N.C. 1, 26, 316 S.E.2d 197, 211, *cert. denied*, 469 U.S.

963, 83 L. Ed. 2d 299 (1984). However, this Court has also stated that "the State is entitled to present witnesses in the penalty phase of the trial to prove the circumstances of prior convictions and is not limited to the introduction of evidence of the record of conviction." *State v. Roper*, 328 N.C. 337, 365, 402 S.E.2d 600, 616, *cert. denied*, 502 U.S. 902, 116 L. Ed. 2d 232 (1991). Additionally, "[i]f the capital felony of which defendant has previously been convicted was a particularly shocking or heinous crime, the jury should be so informed." *State v. Taylor*, 304 N.C. 249, 279, 283 S.E.2d 761, 780 (1981), *cert. denied*, 463 U.S. 1213, 77 L. Ed. 2d 1398 (1983). The admissibility of evidence regarding the circumstances of a defendant's prior convictions "rests in the sound discretion of the trial court." *State v. Jones*, 339 N.C. 114, 151, 451 S.E.2d 826, 846 (1994), *cert. denied*, 515 U.S. 1169, 132 L. Ed. 2d 873 (1995).

The record in this case reveals that the State sought to prove that defendant had previously been convicted of second-degree kidnapping. Defendant argues that kidnapping is an inherently violent felony and that the introduction of the conviction was sufficient to satisfy the State's burden of proof. However, under this Court's precedent in *Roper*, the State is allowed to present the circumstances of the prior felony in order to meet its burden. The trial court determined that evidence concerning the events that took place during the kidnapping was necessary to show that the victim was terrorized by defendant and "that her fear was well founded at the time of the actual kidnapping." To this end, the trial court allowed testimony of domestic violence that occurred before the kidnapping and allowed evidence from the victim that defendant kidnapped her at gunpoint, made her drive to South Carolina, and raped her. After reviewing the record in this case, we conclude that the trial court did not abuse its discretion in allowing the testimony.

Defendant also contends that the trial court should have intervened *ex mero motu* when the prosecutor argued in his closing that, at the time of the kidnapping in 1985, the marital rape exemption prevented defendant from being charged with rape. Defendant contends that the closing argument improperly introduced bad character evidence into the sentencing hearing. However, defendant did not object to this argument at trial; and we cannot say that the argument rises to the level of being so grossly improper as to "impede the defendant's right to a fair trial" and require a holding that the trial court erred in failing to intervene *ex mero motu. State v. Davis*, 305 N.C. 400, 421-22, 290 S.E.2d 574, 587 (1982). This assignment of error is overruled.

**[18]** In the following four assignments of error, defendant contends that the trial court abused its discretion in allowing the prosecutor to make several improper statements in his closing argument during the penalty proceeding. Defendant first asserts that the prosecutor improperly argued that the victim was killed for the purpose of witness elimination. Defendant contends that since the aggravating circumstance that the murder "was committed for the purpose of avoiding or preventing a lawful arrest" was not before the jury for consideration, N.C.G.S. § 15A-2000(e)(4), this prosecution argument was gross speculation that prejudiced defendant and provided an improper basis for the sentencing recommendation. We disagree. Since defendant did not object to this particular argument at trial, he must show that the argument "stray[ed] so far from the bounds of propriety as to impede the defendant's right to a fair trial," such that "the trial court ha[d] the duty to act *ex mero motu.*" *Davis*, 305 N.C. at 422, 290 S.E.2d at 587.

The prosecutor here reviewed previous robberies by defendant and argued, "[T]he defendant is smart and he has learned his lesson. You know what happens when you leave people alive? They come in and testify. He's learned that." The prosecutor continued, "The only way he's going to get away with robbing Mr. Hall of everything that has [] value in that home that he can pick up is to kill him." These remarks were made when discussing the mitigating circumstance that defendant lacked the capacity to appreciate the criminality of his conduct. The State's argument was that defendant had victimized trusting people on previous occasions and that this occasion was no different. A closing argument may include the facts in evidence, as well as any reasonable inferences which arise therefrom. *State v. Parker*, 354 N.C. 268, 291, 553 S.E.2d 885, 901 (2001), *cert. denied*, 535 U.S. 1114, 153 L. Ed. 2d 162 (2002). This argument is a reasonable inference, given defendant's history of crime. Defendant has not shown that these comments were so grossly improper as to require intervention *ex mero motu* by the trial court. We, therefore, overrule this assignment of error.

**[19]** The second statement in the prosecutor's closing argument to which defendant now objects was what defendant characterizes as a misstatement of evidence regarding defendant's confession and the timing of his confession in relation to the return of the DNA results. Defendant points to the following portion of the prosecutor's closing argument as erroneous: "So when was the jig up? I'll tell you when. When these guys came down with DNA, he was painted into a corner

with the victim's blood. That's when he started fast writing. That's when he started this." Defendant argues that these comments misrepresented the facts, since defendant wrote the confession on 4 February 2000 and the DNA testing of physical evidence was not done until much later. Defendant contends such misrepresentation unfairly prejudiced defendant by influencing the jury's sentencing recommendation. We conclude, however, that defendant has failed to show that these comments were so grossly improper as to require the trial court's intervention.

We first note that defendant did not object to this statement during closing. Thus, defendant must show that the statements were grossly improper. *Gregory*, 340 N.C. at 424, 459 S.E.2d at 672. This argument was a reasonable inference from the evidence introduced at trial. The evidence showed that when defendant was taken to the Aiken County jail, his clothes except for his socks and shoes were taken from him and placed in a jail bin. On 4 February 2000, defendant's clothing was seized from the Aiken County jail by a detective pursuant to a search warrant. The detective also asked defendant to remove his socks and shoes. Defendant wrote his confession later that evening, knowing that his clothing had been confiscated. The DNA analysis of the clothing, conducted some time later, revealed that defendant's jeans had the victim's blood on them.

Given the record, we conclude that the evidence permitted the prosecutor to argue the inference that defendant knew DNA evidence was on his confiscated clothing and that this knowledge prompted the confession. Accordingly, the trial court was not required to intervene *ex mero motu*. This assignment of error is overruled.

[20] Defendant also assigns error to the trial court's failure to intervene *ex mero motu* upon hearing the prosecutor argue that defendant was stalking his next victim while waiting in the car at the K-Mart parking lot in Aiken, South Carolina. The portion of the argument with which defendant takes issue reads:

> He was waiting for the next Buddy Hall . . . as he sat in that car, facing the store, with a loaded gun. He was stalking. He was waiting for his next victim. And when does he strike? Only after cool, calm, deliberation. The very essence of premeditation. Stalking, waiting, laying in wait.

Defendant contends that this argument amounted to unreasonable speculation that unfairly affected the reliability of the sentencing decision. We disagree.

As stated above, a prosecutor "is entitled to argue all the facts submitted into evidence as well as any reasonable inferences therefrom." *Gregory*, 340 N.C. at 424, 459 S.E.2d at 672. Several of defendant's previous victims testified at the sentencing hearing, including a woman who testified that defendant came into the bank where she worked and looked around, then left, and came back later to rob the bank. Since defendant previously had committed crimes in which he staked out his victim, a reasonable inference could be made from the evidence in the case at bar that defendant may have been doing the same thing while sitting in the car in front of the K-Mart. The prosecutor made a reasonable inference from the evidence when he argued that, as defendant waited in the K-Mart parking lot after having stolen a car and other possessions from the victim, he was waiting for yet another victim. Defendant did not object to this argument at trial and has not shown that the comment was grossly improper. This assignment of error is overruled.

[21] Finally, defendant argues that the trial court abused its discretion by allowing the State to refer repeatedly to five aggravating circumstances during closing argument when in fact only three aggravating circumstances were submitted. Defendant claims that this error improperly reduced the consideration of aggravators and mitigators to a "numbers game," with the prosecutor attempting to weight the aggravating circumstances by adding to the actual number. We conclude that the prosecutor's arguments were not grossly improper.

Three separate aggravating circumstances were submitted in this case: (i) that defendant had been previously convicted of a felony involving the threat of violence to a person; (ii) that the murder was committed while the defendant was engaged in the commission of a robbery with a dangerous weapon; and (iii) that the murder was especially heinous, atrocious, or cruel. N.C.G.S. § 15A-2000(e)(3), (5), (9) (2003). Three convictions, two for bank robbery and one for kidnapping, were used to support the (e)(3) aggravating circumstance. Defendant concedes that each conviction could have been submitted to the jury as a separate (e)(3) aggravator. However, defendant points to several passages in the prosecutor's closing argument in which the prosecutor referred to five aggravators. For example, the prosecutor argued, "Any one aggravating factor is enough. Here, we have three and, in one of those, we have three within it. That's like five separate things that call for the death penalty, ladies and gentlemen, and any one by itself, let alone all five, is substantially sufficient to call for the

death penalty." In another instance, the prosecutor argued, "You've heard about the five aggravating factors, those three prior convictions . . . those five which are really three, three under one subset." Regarding whether any of the aggravators were "sufficiently substantial" to support the death penalty, the prosecutor stated, "Any one by itself would be, let alone five."

The prosecutor also stated, however, that the weighing process does not involve counting the number of mitigators and the number of aggravators to see which side has the largest number. The trial judge instructed the jury to consider the three aggravating circumstances, and reiterated to the jury:

> You should not merely add up the number of aggravating circumstances and mitigating circumstances. Rather, you must decide from the evidence what value to give each circumstance, and then weigh the aggravating circumstances, so valued, against the mitigating circumstances, so valued, and finally determine whether the mitigating circumstances are insufficient to outweigh the aggravating circumstances.

The copy of the Issues and Recommendation as to Punishment form given to the jurors listed three possible aggravators, (e)(3), (e)(5), and (e)(9), with three prior conviction subsets under the (e)(3) aggravator. The jurors unanimously found the (e)(3) and (e)(5) aggravators, including each of the subsets under (e)(3). One or more jurors found fourteen of the sixteen mitigating circumstances submitted. We hold that the prosecutor's comments were not so grossly improper as to require the trial judge to intervene *ex mero motu*. Moreover, given that the convictions could have been listed as separate aggravators and that the jurors were properly instructed as to the law on the subject, the prosecutor's comments could not have impeded defendant's right to a fair trial. *See Harris*, 308 N.C. at 169, 301 S.E.2d at 98. We overrule this assignment of error.

## INEFFECTIVE ASSISTANCE OF COUNSEL

Defendant contends that his trial counsel provided ineffective assistance in violation of the Sixth Amendment to the United States Constitution at several points throughout the trial. Defendant makes eight distinct claims of ineffective assistance in this case. After considering each in turn, we conclude that for six of these claims defendant has not made the required showing that counsel's performance was constitutionally deficient. The remaining

two claims are dismissed without prejudice for lack of sufficient evidence on the record.

"When a defendant attacks his conviction on the basis that counsel was ineffective, he must show that his counsel's conduct fell below an objective standard of reasonableness." *State v. Braswell,* 312 N.C. 553, 561-62, 324 S.E.2d 241, 248 (1985). In order to meet this burden, a defendant must satisfy a two-part test:

First, the defendant must show that counsel's performance was deficient. This requires showing that counsel made errors so serious that counsel was not functioning as the "counsel" guaranteed the defendant by the Sixth Amendment. Second, the defendant must show that the deficient performance prejudiced the defense. This requires showing that counsel's errors were so serious as to deprive the defendant of a fair trial, a trial whose result is reliable.

*Strickland v. Washington,* 466 U.S. 668, 687, 80 L. Ed. 2d 674, 693 (1984). Prejudice is established by showing "that there is a reasonable probability that, but for counsel's unprofessional errors, the result of the proceeding would have been different. A reasonable probability is a probability sufficient to undermine confidence in the outcome." *Id.* at 694, 80 L. Ed. 2d at 698. Both prongs of this test must be met to prevail on an ineffective assistance of counsel claim. *Id.* at 687, 80 L. Ed. 2d at 693.

This Court has held that "[c]ounsel is given wide latitude in matters of strategy, and the burden to show that counsel's performance fell short of the required standard is a heavy one for defendant to bear." *State v. Fletcher,* 354 N.C. 455, 482, 555 S.E.2d 534, 551 (2001), *cert. denied,* 537 U.S. 846, 154 L. Ed. 2d 73 (2002); *see also State v. Prevatte,* 356 N.C. 178, 236, 570 S.E.2d 440, 472 (2002), *cert. denied,* 538 U.S. 986, 155 L. Ed. 2d 681 (2003). Moreover, this Court indulges the presumption that trial counsel's representation is within the boundaries of acceptable professional conduct. *State v. Fisher,* 318 N.C. 512, 532, 350 S.E.2d 334, 346 (1986). As the United States Supreme Court has stated:

A fair assessment of attorney performance requires that every effort be made to eliminate the distorting effects of hindsight, to reconstruct the circumstances of counsel's challenged conduct, and to evaluate the conduct from counsel's perspective at the time. Because of the difficulties inherent in making the evaluation, a court must indulge a strong presumption that counsel's

conduct falls within the wide range of reasonable professional assistance . . . .

*Strickland v. Washington*, 466 U.S. at 689, 80 L. Ed. 2d at 694.

As to whether an ineffective assistance of counsel claim can be dealt with on appeal, this Court has stated, "[Ineffective assistance of counsel] claims brought on direct review will be decided on the merits when the cold record reveals that no further investigation is required, i.e., claims that may be developed and argued without such ancillary procedures as the appointment of investigators or an evidentiary hearing." *State v. Fair*, 354 N.C. 131, 166, 557 S.E.2d 500, 524 (2001), *cert. denied*, 535 U.S. 1114, 153 L. Ed. 2d 162 (2002) (citations omitted). Therefore, on direct appeal we must determine if these ineffective assistance of counsel claims have been prematurely brought. If so, we must "dismiss those claims without prejudice to the defendant's right to reassert them during a subsequent [motion for appropriate relief] proceeding." *Id.* at 167, 557 S.E.2d at 525.

Defendant lists seven specific areas in which he contends trial counsel was deficient: (i) promising the jury evidence and instructions on self-defense and intoxication based on an erroneous belief that defendant's confession would be admitted as substantive evidence; (ii) concluding that the confession alone would be enough to establish self-defense and intoxication; (iii) failing to object to Deborah McAllister's testimony that she had never known the victim to be violent toward anyone and failing to impeach Ms. McAllister; (iv) conceding defendant's guilt of second-degree murder without his consent; (v) failing to request an instruction in the penalty proceeding that the confession could be considered as substantive evidence; (vi) failing to object to improper prejudicial closing arguments by the prosecutor; and (vii) failing to preserve challenge for cause issues for appeal. Finally, defendant asserts that the cumulative effect of counsel's alleged deficient performance entitles him to a new trial. We now examine each of defendant's ineffective assistance claims.

[22] First, defendant contends that his counsel provided ineffective assistance by representing to the jury in his opening statement that it would hear evidence and instructions on self-defense and intoxication. Defendant argues this declaration constitutes ineffective assistance in that such evidence was never introduced and, thus, the instructions were not given. Counsel failed to deliver on promises made to the jury, thereby reducing his credibility and denying defendant his constitutional right to counsel.

STATE v. CAMPBELL

[359 N.C. 644 (2005)]

Prior to trial the State appeared prepared to introduce defendant's confession into evidence and even had copies ready for jurors. The State responded to the trial court's question as to whether the confession would be offered into evidence by saying, "That remains to be seen what, exactly, we're going to introduce. We remain open to that possibility, but we haven't said we're definitely going to do that yet." During *voir dire*, the State refrained from mentioning self-defense in its questioning of potential jurors, while defense counsel mentioned the confession to potential jurors and asked if they could consider evidence of self-defense and intoxication. The trial court cautioned defense counsel against "assum[ing] things that we're not sure are going to happen." In opening argument the State did not mention self-defense or the confession. Despite not knowing if the State would indeed introduce the confession, defense counsel argued in his opening statement to the jury that defendant had been forced to defend himself against an attack by the victim and discussed the details of the confession. Defense counsel continued, "The evidence will show that the combination of the alcohol, the fatigue and fear left [defendant] unable to think clearly." Counsel also mentioned self-defense and the State's burden of proof to prove that defendant was not acting in self-defense.

During its case-in-chief, the State later announced outside the presence of the jury that the confession would not be introduced as evidence. The confession was not admitted as substantive evidence in either the guilt phase or penalty proceeding, and no instructions were given on either self-defense or intoxication. The only purpose for which the confession was offered was to assist the jury in weighing the credibility of defendant's expert witness. Defendant did not testify, and defendant presented no substantive evidence of self-defense or intoxication, yet the defense asked the jury in closing argument at the guilt phase to find intoxication and self-defense on the basis of the confession, which was never introduced.

Defendant contends that defense counsel, by repeatedly ignoring the possibility that the State would not introduce the confession as evidence at trial, violated his duty to defendant to be knowledgeable about the law and, in particular, about the Rules of Evidence. Defendant further argues that defense counsel's mistaken belief that the confession could be introduced through other means resulted in counsel's belatedly abandoning the theory of self-defense, when counsel could have changed strategy earlier and prevented making false promises to the jury. Defendant also asserts that the broken

STATE v. CAMPBELL

[359 N.C. 644 (2005)]

promise made to the jury undermined the credibility of the defense and that this situation was further exacerbated when the prosecution emphasized the lack of evidence of self-defense or voluntary intoxication in its closing argument. Defendant contends these failings on counsel's part prevented the State's case from being subjected to adversarial testing.

Although the State signaled at the beginning of the trial that it might not introduce defendant's confession, defense counsel throughout jury *voir dire* and in opening statement referred to details of defendant's confession. This confession was never introduced as substantive evidence at trial. However, from the record before us, we can only speculate as to why defense counsel chose to argue self-defense. Thus, in this case evidentiary issues need to be developed before defendant will be in a position to adequately present his possible ineffective assistance claim on this issue.

In a related claim defendant contends that his trial counsel was ineffective for concluding that even if defendant's confession were admitted into evidence, the confession would be sufficient standing alone to establish self-defense and intoxication. Defendant further asserts that a competent attorney would have had defendant testify on his own behalf in order to make a prima facie case of self-defense or intoxication. The State, on the other hand, argues that the decision not to have defendant testify is a reasonable trial strategy in that it would keep defendant's violent criminal history from the jury. Defendant asserts, though, that the State had copies of the prior convictions and would have submitted them in the sentencing proceeding if necessary. Defendant argues that admission of the prior violent felony convictions coupled with a self-defense or intoxication argument would put defendant at risk of life without parole; but without either of these claims, defendant risked death.

This ineffective assistance of counsel claim and defendant's previous claim related to representations at opening argument are interdependent and go to the crux of defendant's trial strategy. In that we cannot ascertain from the record the reason for defense counsel's strategy, these issues require further evidentiary development. Accordingly, we dismiss these claims without prejudice to defendant to pursue them in a post-conviction motion for appropriate relief.

[23] In his third ineffective assistance claim, defendant asserts that his trial counsel was deficient in failing to object to the testimony of Deborah McAllister, the victim's grand-niece, who stated that she had

never known the victim to be violent toward anyone. Further, defendant contends that his counsel should have attempted to impeach Ms. McAllister with inquiry about specific instances of the victim's violent conduct. Also, defense counsel was deficient in asking the court for permission to impeach this witness and in failing to obtain a ruling when the court did not rule on the request. Defendant notes that when the prosecutor questioned Ms. McAllister, no evidence of the victim's propensity for violence had yet been introduced. Defendant argues that the question to Ms. McAllister regarding her knowledge of any violent tendencies on the victim's part elicited evidence of the victim's character for peacefulness and was improper under N.C.G.S. § 8C-1, Rule 404(a)(2). Defendant asserts that if his counsel had known the Rules of Evidence, counsel would have known that the question was improper and would have objected.

Even assuming *arguendo* that it was improper for the trial court to allow the question when defendant had not introduced evidence of the victim's character, we find that defendant does not meet the second prong of the *Strickland* test, which requires defendant to show prejudice, that is, but for counsel's failure to object to this question a reasonable probability exists that the outcome of the trial would have been different. *Strickland v. Washington*, 466 U.S. at 687, 694, 80 L. Ed. 2d at 693, 698. The specific instances of conduct that defendant argues should have been used to impeach Ms. McAllister were not allowed by the trial court in either the guilt phase or the sentencing proceeding. We have already considered defendant's assignment of error that this evidence of a prior violent sexual act by the victim against an unidentified male should have been allowed, and we have determined that the evidence was properly excluded. Moreover, sound strategic reasons exist for not attempting to impeach a biased witness when the answer to the question is unknown. Inquiry of Ms. McAllister about her knowledge of the specific incident would likely have produced a negative answer. Thus, we conclude that defendant was not prejudiced by his counsel's actions or inactions regarding this witness. This assignment of error is overruled.

**[24]** Next, defendant contends that his counsel provided ineffective assistance by conceding guilt of second-degree murder in closing argument to the jury without his consent. The relevant portion of defense counsel's closing argument reads:

And what I'm telling you folks right now, that right there is enough for you to have reasonable doubt. The fact that you have

one expert who is saying can't form the specific intent to either rob or kill and the state's own expert comes in and says, I can't rule it out 100 percent, there's your reasonable doubt right there. That's all you need. That's the key to this case. That's all you need. You weigh the evidence out. You make that determination. But right there is all the reasonable doubt you would need in this case.

. . . .

Again, I submit to you, as I think I said earlier, not every homicide is a first degree murder case, and there's plenty of second degree murder cases out there that are a whole lot bloodier and a whole lot more gory and a whole lot more horrific than first degree murder cases. *The only difference is a second degree murder case lacks that specific intent element, and I submit to you that's where we're at in this case, folks.* There is so much going on, there is so much going on in this case. There is plenty of hooks for you to hang your hat on and find reasonable doubt in this case.

Defendant contends that the italicized sentence of this argument is similar to that advanced by trial counsel in *State v. Harbison*, 315 N.C. 175, 337 S.E.2d 504 (1985), *cert. denied*, 476 U.S. 1123, 90 L. Ed. 2d 672 (1986).

In *Harbison* this Court granted the defendant a new trial based on closing arguments by his attorney. *Id.* at 180-81, 337 S.E.2d at 507-08. In that case the defendant maintained throughout his trial that he had acted in self-defense. *Id.* at 177, 337 S.E.2d at 506. Trial counsel adhered to that defense during the presentation of evidence by the State and the defense. *Id.* One of the defendant's attorneys continued to use that theory during his closing argument, but the defendant's other attorney expressed his personal opinion that the defendant should not be acquitted on the theory of self-defense but should be convicted of manslaughter rather than first-degree murder. *Id.* at 177-78, 337 S.E.2d at 506. The defendant expressly alleged that he had not consented to this change in theory. *Id.* at 177, 337 S.E.2d at 505-06. This Court stated in *Harbison* that "when counsel to the surprise of his client admits his client's guilt, the harm is so likely and so apparent that the issue of prejudice need not be addressed." *Id.* at 180, 337 S.E.2d at 507. The Court specifically held that the attorney's concession of guilt without the consent of his client amounted to *per se* ineffective assistance. *Id.* at 180, 337 S.E.2d at 507-08.

The statement in this case about which defendant complains is distinguishable from that made by the *Harbison* attorney and does not amount to ineffective assistance. Trial counsel here was pointing out to the jury that specific intent was lacking in this case and that the lack of specific intent was the only difference between second-degree and first-degree murder. Defense counsel was arguing to the jury that, without specific intent, the most serious crime for which defendant could be convicted would be second-degree murder. This situation differs substantially from *Harbison*, where the attorney argued, " 'I think you should find him guilty of manslaughter and not first degree.' " *Id.* at 178, 337 S.E.2d at 506. *See State v. Harvell*, 334 N.C. 356, 361, 432 S.E.2d 125, 128 (1993) (holding that counsel did not admit the defendant was guilty of a crime when counsel noted that, if the evidence established the commission of any crime, that crime was voluntary manslaughter, not murder). The statement in the present case does not constitute ineffective assistance. This assignment of error is overruled.

[25] Next, defendant contends that his counsel provided ineffective assistance by failing to request an instruction from the trial court that defendant's confession could be considered as substantive evidence in the sentencing proceeding. Defendant's statement was read to the jury by defendant's expert during the guilt phase. At that time the trial court gave a limiting instruction that the statement was to be considered for the sole purpose of determining the weight to be given to the testimony of defendant's expert, who had relied on the statement. The statement was not introduced as substantive evidence at any time in the guilt phase. Defendant argues that the jury would not have had reason to believe that the statement could be considered as substantive evidence given the trial court's guilt phase limiting instruction, the prosecutor's guilt phase closing argument in which he emphasized that defendant's statement was not evidence, and the sentencing proceeding instructions. Defendant now suggests that his trial counsel should have requested an instruction clarifying for the jury that it could consider as substantive any and all evidence submitted in the guilt phase. Counsel's failure to do so, defendant argues, constituted ineffective assistance and deprived defendant of his constitutional rights. This contention has no merit.

Throughout defendant's closing argument in the sentencing proceeding, defendant's counsel, without objection from the prosecutor or intervention by the trial court, argued the substance of defendant's

statement. Counsel stressed that the character witnesses who testified that the victim had a reputation in the community for luring younger men to his home for sexual encounters corroborated defendant's statement and Dr. Corvin's opinion and findings. Counsel also recited the details of the events leading up to the murder as outlined in defendant's statement. Counsel argued that defendant's statement showed he acknowledged wrongdoing and that the murder was the result of an overaction in which defendant just kept hitting the victim, not the result of a plan to kill. Thus, the jurors were afforded the opportunity to consider the defendant's character and the circumstances surrounding the crime in weighing whether, in light of the aggravating and mitigating circumstances, defendant deserved a sentence less than death. *See Lockett v. Ohio*, 438 U.S. 586, 604, 57 L. Ed. 2d 973, 990 (1978). Defendant has failed to show that a reasonable probability exists that the outcome of the trial would have been different had trial counsel requested an instruction that the statement be considered as substantive evidence. Thus, defendant has not satisfied the prejudice prong of *Strickland*; and this assignment of error is overruled.

**[26]** Defendant also asserts that his counsel was ineffective for failing to object to several portions of the State's closing arguments in both the guilt phase and the sentencing proceeding. Specifically, defendant contends that his trial counsel should have objected to the following: (i) the argument that defendant was intending to rob the K-Mart; (ii) the demeaning reference to the monetary compensation of defendant's expert witness, Dr. Corvin, and a misstatement of Dr. Corvin's testimony; (iii) the argument regarding evidence of alleged rapes previously committed by defendant; (iv) the argument that defendant killed the victim for the purpose of eliminating a witness to his actions; (v) the argument implying that defendant did not confess until his DNA was collected; (vi) the argument that defendant was stalking his next victim at the Aiken K-Mart; and (vii) the references to five aggravators instead of the three that were submitted to the jury.

We have reviewed each of these arguments above for substantive error and have found that none of the arguments was so grossly improper as to render the trial fundamentally unfair. Having concluded that these prosecution arguments did not render defendant's trial fundamentally unfair, we further conclude that a reasonable probability does not exist that the outcome of the trial would have been different had defendant objected to them. Trial counsel was not

deficient for not objecting to each of these arguments. Therefore, this assignment of error is overruled.

[27] Defendant next argues that his counsel's failure to preserve for appeal the trial court's denial of three challenges for cause constituted ineffective assistance. Defendant challenged prospective jurors Ricky Hall, William Ellison, and Heidi Elliott for cause. All three challenges were denied by the trial court, resulting in defendant's use of peremptory challenges to remove the three jurors. Defendant exhausted all of his peremptory challenges, but defense counsel did not request additional peremptory challenges and renew the challenges for cause after exercising the last peremptory challenge. Defendant contends that the failure to renew the challenges constituted ineffective assistance of counsel. We disagree.

To establish ineffective assistance, a "defendant must show that the deficient performance prejudiced the defense." *Strickland v. Washington*, 466 U.S. at 687, 80 L. Ed. 2d at 693. This Court has said that to preserve *voir dire* issues for appeal, a defendant must follow the procedures set out in section 15A-1214(h) of the North Carolina General Statutes. *State v. Hartman*, 344 N.C. 445, 458, 476 S.E.2d 328, 335 (1996), *cert. denied*, 520 U.S. 1201, 137 L. Ed. 2d 708 (1997). The statute requires that

'Where the court has refused to stand aside a juror challenged for cause, and the party has then peremptorily challenged him, in order to get the benefit of his exception he must exhaust his remaining peremptory challenges, and then challenge another juror peremptorily to show his dissatisfaction with the jury, and except to the refusal of the court to allow it.'

*State v. Watson*, 310 N.C. 384, 396, 312 S.E.2d 448, 456 (1984) (citations omitted). The statute also requires that challenges for cause be renewed after the exhaustion of peremptory challenges. N.C.G.S. § 15A-1214(h) (2003).

"The trial judge has broad discretion to regulate jury *voir dire*." *State v. Knight*, 340 N.C. 531, 558, 459 S.E.2d 481, 497 (1995) (citing *State v. Lee*, 335 N.C. 244, 268, 439 S.E.2d 547, 559, *cert. denied*, 513 U.S. 891, 130 L. Ed. 2d 162 (1994)). "The granting of a challenge for cause where the juror's fitness or unfitness is arguable is a matter within the sound discretion of the trial court and will not be disturbed absent a showing of abuse of discretion." *Abraham*, 338 N.C. at 343, 451 S.E.2d at 145. To obtain relief relating to jury *voir dire*, a defendant must show not only an abuse of discretion, but also preju-

dice. *State v. Frye*, 341 N.C. 470, 494, 461 S.E.2d 664, 675 (1995), *cert. denied*, 517 U.S. 1123, 134 L. Ed. 2d 526 (1996). "The purpose for challenging the additional juror is to establish prejudice by showing that appellant was forced to seat a juror whom he did not want because of the exhaustion of his peremptory challenges." *Hartman*, 344 N.C. at 459-60, 476 S.E.2d at 336. Thus, in this case, if the trial court's alleged error had been properly preserved for review on direct appeal, defendant would have had to show that the trial court abused its discretion by refusing to dismiss one or more of the three jurors for cause and that having used his peremptory challenges, defendant was forced to seat a juror whom he did not want.

We now turn to a review of the *voir dire* of each of the three jurors at issue here. First, defendant complains that prospective juror Ricky Hall indicated that he was bothered by the fact that defendant might not testify. Ricky Hall said that he could follow the law, but that he "would like to see that person speak for hisself [sic]." The court then questioned Mr. Hall:

> THE COURT: Can you set aside what you would like to personally see?
>
> [MR. HALL]: Yes, sir.
>
> THE COURT: And apply the law that a defendant's silence is not to influence your decision in any way?
>
> [MR. HALL]: Yes, sir.
>
> THE COURT: In other words, you can't—that's not a proper area of deliberation for the jury.
>
> [MR. HALL]: I understand. Yes, sir, I could.
>
> THE COURT: You could do that?
>
> [MR. HALL]: Yes, sir.

Defense counsel continued his questioning:

> MR. HECKART: Mr. Hall, the judge gave you the instruction and, as I perceived it, you responded that it was still going to cause you concern if he did not testify.
>
> [MR. HALL]: (JUROR NODDED HEAD.)
>
> MR. HECKART: Then the judge asked you if you could disregard that if he told you to, and you indicated that you could.

[MR. HALL]: Yes, sir.

MR. HECKART: I mean, this—

[MR. HALL]: I've got—I know what you're saying.

MR. HECKART: It sounds to me like you're going back and forth.

[MR. HALL]: Yeah, I understand what you're saying. I mean, through everything I've heard, you might have feelings, certain feelings, on certain things, but if that's not the way the law is and you're instructed to do that, like on a job or whatever, that's what we have to go by. That's what I'm getting at. I might have a feeling about it but, if I'm instructed one way—and just like on the job—

MR. HECKART: All right.

[MR. HALL]: —you have to do what you're told. Do you know what I'm saying?

MR. HECKART: Yes, sir, but I guess really getting down to the heart of the matter is, can you honestly do that as an individual, having that belief in the back of your head that you really ought to hear from him, do you feel like, in your mind—

[MR. HALL]: Right.

MR. HECKART: —you ought to hear from him? You feel like he ought to testify or he ought to explain himself? Can you actually do that?

[MR. HALL]: Like I said, the only thing I can honestly say is, I could do the very best that I could do.

MR. HECKART: All right. Thank you, Mr. Hall. I appreciate your time and honesty.

Defendant contends that this exchange is similar to an exchange this Court considered in *State v. Hightower* in which a prospective juror's equivocation about being able to follow the law on a defendant's right not to testify resulted in this Court's finding error. *State v. Hightower*, 331 N.C. 636, 641, 417 S.E.2d 237, 240 (1992). We hold, though, that Mr. Hall's statements are more like the prospective juror's statement in *State v. Jaynes*, 353 N.C. 534, 546, 549 S.E.2d 179, 190 (2001), *cert. denied*, 535 U.S. 934, 152 L. Ed. 2d 220 (2002). In *Jaynes*, when questioned whether knowledge that defendant had

received a death sentence at his first trial would influence her decision at defendant's retrial, a prospective juror replied, she would "do [her] best to base her determination on the evidence presented." *Id.* Where "a prospective juror can disregard prior knowledge and impressions, follow the trial court's instructions on the law, and render an impartial, independent decision based on the evidence, excusal is not mandatory." *State v. Green*, 336 N.C. 142, 167, 443 S.E.2d 14, 29, *cert. denied*, 513 U.S. 1046, 130 L. Ed. 2d 547 (1994). From the *voir dire* examination, the trial court could reasonably conclude that Mr. Hall satisfied these criteria and could set aside his personal feelings. Therefore, the trial court did not abuse its discretion by denying the challenge for cause; and defense counsel was not ineffective for failing to renew this challenge.

Defendant also asserts that prospective juror William Ellison should have been excused on the basis that he was an acquaintance of a witness in the case, Jody Woodcock, a deputy with the Pender County Sheriff's Department. Additionally, defendant contends that Mr. Ellison showed he was unable to follow the law regarding defendant's decision not to testify. After reviewing the record, however, we conclude that the trial court did not abuse its discretion in denying defendant's challenge for cause.

During preliminary *voir dire*, Mr. Ellison told the court that he served with Deputy Woodcock as a volunteer fireman for the Atkinson Fire Department. Defendant contends that Mr. Ellison showed his bias with regard to Deputy Woodcock after being asked if he would automatically believe the deputy's word by stating, "I wouldn't call him a liar because . . . as a volunteer fire fighter, I do trust his—my life is in his hands, at times." Mr. Ellison also said, "I wouldn't sit here and say every word that comes out of his mouth is the honest God truth, but I couldn't call him a liar, neither; I wouldn't." Upon further questioning, Mr. Ellison stated he was taught to believe law enforcement officers and to trust his co-workers, but that he would look at each witness individually as that person testified. In individual *voir dire*, Mr. Ellison revealed to the court that the instant case had been discussed at the firehouse and that he might run into Deputy Woodcock at the firehouse. He said if he had to make a decision whether to believe Deputy Woodcock or another witness, if "he was the last man standing, I would have to take his word." However, he also stated that he and Deputy Woodcock were not good friends but that they did see each other. Mr. Ellison also said that he could follow the law, that he knew witnesses could be wrong or mis-

STATE v. CAMPBELL

[359 N.C. 644 (2005)]

taken, and that he could apply the same test of truthfulness as in everyday interactions. He further stated that he could follow the court's instructions on witness credibility and that there was no reason he could not follow them.

Mere acquaintance with a witness is not enough to require excusal for cause. *State v. Benson*, 323 N.C. 318, 324, 372 S.E.2d 517, 520 (1988). If a juror knows a witness or witnesses but states that he can follow the trial judge's instructions and can follow the law, that juror is not automatically subject to removal for cause. *Green*, 336 N.C. at 167, 443 S.E.2d at 29. This Court has stated, "We presume that jurors will tell the truth; our court system simply could not function without the ability to rely on such presumptions." *State v. Barnes*, 345 N.C. 184, 207, 481 S.E.2d 44, 56 (1997), *cert. denied*, 523 U.S. 1024, 140 L. Ed. 2d 473 (1998). The trial judge was in the best position to evaluate the credibility of the juror. *Dickens*, 346 N.C. at 42, 484 S.E.2d at 561. We conclude that the denial of defendant's challenge for cause on this basis was not an abuse of discretion.

Defendant also points to statements by prospective juror Ellison that indicated a possible bias against defendant for failing to testify. After being asked if defendant's decision not to testify would affect his decision-making, Mr. Ellison stated that "it would be in my mind, but I don't think it would be effective to my decision" and that "it would not affect my decision but, yes, it would be in my mind." The trial judge later questioned the prospective juror further on this issue:

THE COURT: Mr. Ellison, you were asked some questions about should the defendant decide not to testify, and I need to instruct you that, in every criminal case, should the defendant choose not to testify, the law of North Carolina gives him that privilege, okay? Do you understand that?

[MR. ELLISON]: Oh, yes, sir.

THE COURT: The same law also assures him that his decision not to testify creates no presumption against him. Do you understand that?

[MR. ELLISON]: Yes, sir.

THE COURT: And the law also says that his silence is not to influence your decision in any way. Do you understand that?

[MR. ELLISON]: Yes, sir.

THE COURT: Is there any reason why you could not follow those instructions?

[MR. ELLISON]: Oh, no, sir . . . .

This exchange illustrates Mr. Ellison's ability to follow the law as given to him by the trial judge. As noted above, the trial court was able to observe the juror and to weigh his credibility as he answered the questions. *Id.* We, thus, conclude that the trial judge did not abuse his discretion in denying defendant's challenge for cause to Mr. Ellison. Therefore, defense counsel's performance was not deficient for failing to renew the challenge for cause.

Finally, defendant complains about several statements by prospective juror Heidi Elliott. Defendant specifically points to Ms. Elliott's beliefs that drinking does not provide any excuse for criminal behavior, that people claim being a victim of a homosexual assault as a "cop-out" for their behavior, that life without parole for first-degree murder is not a sufficiently severe punishment, that death is a more appropriate punishment for first-degree murder, and that life without parole is an unfair punishment because taxpayers have to pay to keep a person incarcerated when that person has taken the life of another. Defendant contends that Ms. Elliott's answers to the court's questions were not credible and that she was parroting the "correct" answers in order to remain on the jury and give defendant a death sentence. We disagree.

After being questioned on each issue, Ms. Elliott was asked whether she could follow the law and put aside her predispositions and give fair consideration to all the evidence, including evidence of alcohol use and impairment, and whether she could weigh both life and death as punishments. Although initially she stated she did not think that life without parole was a severe enough punishment for murder, upon further questioning, she said she could consider it. The court then asked:

THE COURT: . . . So I need to ask you straight up if you would automatically impose the death penalty, no matter what the facts or circumstances may be in this case.

[MS. ELLIOTT]: I would weigh both decisions. I would give them equal weight.

THE COURT: So you could fairly consider the punishment of life in prison without parole and the death penalty for someone who has been convicted of first degree murder?

[Ms. ELLIOTT]: I could.

THE COURT: Okay. You talked—you had some predispositions one way or the other. I need to ask you if you can honestly set aside those predispositions that you may have and fairly consider both possible punishments.

[Ms. ELLIOTT]: Yes, sir.

THE COURT: And can you [set] aside those predispositions that you may have and follow the instructions of the court—

[Ms. ELLIOTT]: Yes, sir.

THE COURT: —in arriving at a just verdict?

[Ms. ELLIOTT]: Yes, sir.

THE COURT: And an appropriate punishment, no matter what that punishment may be?

[Ms. ELLIOTT]: Yes, sir.

In determining whether a prospective juror's views on capital punishment warrant exclusion for cause, the "standard is whether the juror's views would 'prevent or substantially impair the performance of his duties as a juror in accordance with his instructions and his oath.' " *Wainwright v. Witt*, 469 U.S. 412, 424, 83 L. Ed. 2d 841, 851-52 (1985) (quoting *Adams v. Texas*, 448 U.S. 38, 45, 65 L. Ed. 2d 581, 589 (1980)). *See Morgan v. Illinois*, 504 U.S. 719, 732-33, 119 L. Ed. 2d 492, 502 (1992). In this case Ms. Elliott's unequivocal statements that she could set aside her predispositions and follow the law show her excusal was not mandatory. *Green*, 336 N.C. at 167, 443 S.E.2d at 29. Once again, the trial judge was able to observe Ms. Elliott as she answered the questions. *Dickens*, 346 N.C. at 42, 484 S.E.2d at 561. Given our presumption that jurors tell the truth, *Barnes*, 345 N.C. at 207, 481 S.E.2d at 56, we have no reason to hold that the trial court abused its discretion by denying defendant's challenge for cause. Therefore, defense counsel was not deficient for failing to renew this challenge for purposes of appellate review.

Moreover, assuming *arguendo* that the trial court ruled improperly in denying any one of these three challenges for cause, defendant has failed to demonstrate he was forced to seat a juror with whom he was dissatisfied. The record reflects that after defendant exercised his fourteenth and final peremptory challenge to remove

Ms. Elliott, two jurors in the panel of twelve remained to be seated. Defendant did not challenge either of these jurors for cause or attempt to remove them with a peremptory challenge to signify dissatisfaction. One of these two jurors who was initially seated, Mr. Allocco, was dismissed from the jury and replaced by an alternate during the guilt phase of the trial. In asserting the ineffective assistance claim on appeal, defendant has not directed the Court's attention to any basis for defendant's dissatisfaction with the remaining juror, Ms. Thorpe. Moreover, selection of the alternate jurors is not an issue since defendant did not exhaust his three alternate peremptory challenges. Thus, defendant has failed to show that trial counsel's alleged deficient performance in not renewing the challenges for cause as to Hall, Ellison, and Elliott prejudiced defendant. Defendant has not satisfied the *Strickland* test for ineffective assistance of counsel with regard to these challenges for cause. This assignment of error is overruled.

Finally, defendant contends that the cumulative effect of his counsel's constitutionally deficient performance requires reversal of his conviction. However, in view of our resolution of defendant's ineffective assistance of counsel claims, defendant has shown no basis for reversal on direct appeal of his first-degree murder conviction or his death sentence for ineffective assistance of counsel. As noted earlier, two of defendant's ineffective assistance claims have been dismissed without prejudice to defendant's right to reassert them in a post-conviction motion for appropriate relief. Therefore, this assignment of error is overruled.

## PRESERVATION ISSUES

Defendant raises four additional issues that this Court has previously decided contrary to his position: (i) whether the death sentence imposed in this case violates the International Covenant on Civil and Political Rights to which the United States is a party; (ii) whether the trial court lacked jurisdiction to enter a death sentence for the reason that the indictment failed to include the aggravating circumstances relied on by the State; (iii) whether the trial court lacked jurisdiction to enter a death sentence due to the short-form indictment's failure to allege premeditation and deliberation or that the killing was committed in the course of the crime of robbery with a dangerous weapon; and (iv) whether defendant was deprived of his constitutional right to counsel by his counsel's failure to file a motion to dismiss the indictment for failing to allege all elements of first-degree murder.

Defendant raises these issues to urge this Court to reexamine its prior holdings. We have considered defendant's arguments on these issues and conclude defendant has shown no compelling reason to depart from our previous holdings. These assignments of error are overruled.

## PROPORTIONALITY

[28] Finally, this Court has the exclusive statutory duty in capital cases pursuant to N.C.G.S. § 15A-2000(d)(2), to review the record and determine: (i) whether the record supports the jury's findings of any aggravating circumstances upon which the court based its death sentence; (ii) whether the sentence was imposed under the influence of passion, prejudice, or any other arbitrary consideration; and (iii) whether the death sentence is excessive or disproportionate to the penalty imposed in similar cases, considering both the crime and the defendant. *State v. McCollum*, 334 N.C. 208, 239, 433 S.E.2d 144, 161 (1993), *cert. denied*, 512 U.S. 1254, 129 L. Ed. 2d 895 (1994).

After a thorough review of the transcript, record on appeal, briefs, and oral arguments of counsel, we conclude that the jury's finding of the two distinct aggravating circumstances submitted was supported by the evidence. We also conclude that nothing in the record suggests defendant's death sentence was imposed under the influence of passion, prejudice, or any other arbitrary factor.

Finally, we must consider whether the imposition of the death penalty in defendant's case is proportionate to other cases in which the death penalty has been affirmed, considering both the crime and the defendant. *State v. Robinson*, 336 N.C. 78, 132-33, 443 S.E.2d 306, 334 (1994), *cert. denied*, 513 U.S. 1089, 130 L. Ed. 2d 650 (1995). The purpose of proportionality review is "to eliminate the possibility that a person will be sentenced to die by the action of an aberrant jury." *State v. Holden*, 321 N.C. 125, 164-65, 362 S.E.2d 513, 537 (1987), *cert. denied*, 486 U.S. 1061, 100 L. Ed. 2d 935 (1988). Proportionality review also acts "[a]s a check against the capricious or random imposition of the death penalty." *State v. Barfield*, 298 N.C. 306, 354, 259 S.E.2d 510, 544 (1979), *cert. denied*, 448 U.S. 907, 65 L. Ed. 2d 1137 (1980), *overruled in part on other grounds by State v. Johnson*, 317 N.C. 193, 203-04, 344 S.E.2d 775, 782 (1986). Our consideration is limited to those cases that are roughly similar as to the crime and the defendant, but we are not bound to cite every case used for comparison. *State v. Syriani*, 333 N.C. 350, 400, 428 S.E.2d 118, 146, *cert. denied*, 510 U.S. 948, 126 L. Ed. 2d 341 (1993). Whether the death

penalty is disproportionate "ultimately rest[s] upon the 'experienced judgments' of the members of this Court." *Green*, 336 N.C. at 198, 443 S.E.2d at 47 (quoting *State v. Williams*, 308 N.C. 47, 81, 301 S.E.2d 335, 356, *cert. denied*, 464 U.S. 865, 78 L. Ed. 2d 177 (1983)).

In the case at bar, defendant was convicted of first-degree murder on the bases of malice, premeditation and deliberation and under the felony murder rule. The jury found two of the three aggravating circumstances submitted: (i) that the defendant had been previously convicted of a felony involving the use or threat of violence to the person, N.C.G.S. § 15A-2000(e)(3), and (ii) that the murder was committed while the defendant was engaged in the commission of robbery with a dangerous weapon, *id.* § 15A-2000(e)(5). A third aggravating circumstance was submitted but not found by the jury: that the murder was especially heinous, atrocious, or cruel, *id.* § 15A-2000(e)(9).

The trial court submitted three statutory mitigating circumstances for the jury's consideration, namely: (i) the capital felonies were committed while defendant was under the influence of mental or emotional disturbance, *id.* § 15A-2000(f)(2); (ii) defendant's capacity to appreciate the criminality of his conduct or to conform his conduct to the requirements of the law was impaired, *id.* § 15A-2000(f)(6); and (iii) the catchall mitigating circumstance that there existed any other circumstance arising from the evidence which the jury deemed to have mitigating value, *id.* § 15A-2000(f)(9). The jury found the (f)(2) and (f)(6) mitigating circumstances to exist. The trial court also submitted thirteen nonstatutory mitigating circumstances; the jury found twelve of these circumstances to exist.

In our proportionality analysis we compare this case to those cases in which this Court has determined the sentence of death to be disproportionate. This Court has determined the death sentence to be disproportionate on eight occasions. *State v. Kemmerlin*, 356 N.C. 446, 573 S.E.2d 870 (2002); *State v. Benson*, 323 N.C. 318, 372 S.E.2d 517 (1988); *State v. Stokes*, 319 N.C. 1, 352 S.E.2d 653 (1987); *State v. Rogers*, 316 N.C. 203, 341 S.E.2d 713 (1986), *overruled in part on other grounds by State v. Gaines*, 345 N.C. 647, 483 S.E.2d 396, *cert. denied*, 522 U.S. 900, 139 L. Ed. 2d 177 (1997), *and by State v. Vandiver*, 321 N.C. 570, 364 S.E.2d 373 (1988); *State v. Young*, 312 N.C. 669, 325 S.E.2d 181 (1985); *State v. Hill*, 311 N.C. 465, 319 S.E.2d 163 (1984); *State v. Bondurant*, 309 N.C. 674, 309 S.E.2d 170 (1983); *State v. Jackson*, 309 N.C. 26, 305 S.E.2d 703 (1983). This case is not

substantially similar to any of the cases in which this Court has found that the death sentence was disproportionate.

We also consider cases in which this Court has found the death penalty to be proportionate. In this case defendant killed the victim in the victim's home. "A murder in the home 'shocks the conscience, not only because a life was senselessly taken, but because it was taken [at] an especially private place, one [where] a person has a right to feel secure.' " *State v. Adams*, 347 N.C. 48, 77, 490 S.E.2d 220, 236 (1997) (quoting *State v. Brown*, 320 N.C. 179, 231, 358 S.E.2d 1, 34, *cert. denied*, 484 U.S. 970, 98 L. Ed. 2d 406 (1987)) (alterations in original), *cert. denied*, 522 U.S. 1096, 139 L. Ed. 2d 878 (1998); *accord State v. Nicholson*, 355 N.C. 1, 72, 558 S.E.2d 109, 155, *cert. denied*, 537 U.S. 845, 154 L. Ed. 2d 71 (2002). Defendant was convicted based on premeditation and deliberation and under the felony murder rule. "The finding of premeditation and deliberation indicates a more cold-blooded and calculated crime." *State v. Artis*, 325 N.C. 278, 341, 384 S.E.2d 470, 506 (1989), *judgment vacated on other grounds*, 494 U.S. 1023, 108 L. Ed. 2d 604 (1990). Also, the jury in this case found the (e)(3) and (e)(5) aggravating circumstances. This Court has deemed either the (e)(3) or (e)(5) aggravating circumstance, standing alone, sufficient to sustain a sentence of death. *State v. Bacon*, 337 N.C. 66, 110 n.8, 446 S.E.2d 542, 566 n.8 (1994), *cert. denied*, 513 U.S. 1159, 130 L. Ed. 2d 1083 (1995). Viewed in this light, the present case is more analogous to cases in which we have found the death sentence proportionate than to those cases in which we have found the sentence disproportionate or to those cases in which juries have consistently returned recommendations of life imprisonment.

Defendant received a fair trial and capital sentencing proceeding, free from prejudicial error; and the death sentence in this case is not disproportionate. Accordingly, the judgment of the trial court is left undisturbed.

NO ERROR.

Justice NEWBY did not participate in the consideration or decision of this case.